## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DENISE TENNANT,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>DISTRICT OF COLUMBIA,<br><br>　　　　　　　Defendant. | Civil Action No. 19-2949 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiff Denise Tennant, a former Probation Officer in the Court Social Services Division ("CSSD") of the Superior Court of the District of Columbia, has sued her former employer under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*., alleging discrimination and retaliation based on sex and her disabilities, and interference with her FMLA rights in a five-count complaint, Compl., ECF No. 1.  Defendant has moved to dismiss three of those five counts, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief can be granted.  *See* Def.'s Mot. to Partially Dismiss Pl.'s Compl. ("Def.'s Mot."), ECF No. 7.  For the reasons explained below, defendant's motion is denied.

## I.    BACKGROUND

Plaintiff worked as a CSSD probation officer for almost nine years, from March 29, 2010, until her December 3, 2018 termination, and never received a rating of less than commendable performance.  Compl. ¶¶ 12–13.[1]  As a probation officer, plaintiff "supervised

---

[1]    While the Complaint states plaintiff's termination date to be December 3, 2018, Compl. ¶ 12, which date is confirmed in her opposition to the pending motion, *see* Pl.'s Mem. of Points & Auths. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), at 17, ECF No. 8, the complaint also suggests other termination dates, *see, e.g*. Compl. ¶ 74 (noting

juveniles charged with or convicted of criminal offenses [and] conducted home curfew visits and school visits." *Id*. ¶ 18.  Over her tenure with CSSD, plaintiff conducted that work from several different offices.  As relevant to this action, between March 2014 and December 3, 2018, plaintiff was assigned to the Northeast Regional Office's Leaders of Today in Solidarity (LOTS) Balanced and Restorative Justice Center ("BARJ").  *Id*. ¶ 17.  This assignment was "in addition to . . . her juvenile caseload."  *Id*. ¶ 19.  Plaintiff describes BARJ as a "healthy and secure environment for juvenile offenders to attend after-school activities, including group and individual counseling," educational programs and mentorship events.  *Id*.  Her duties included helping juvenile participants develop their social skills, overseeing the juveniles' mentors and tutors, and even preparing meals.  *Id*.  Plaintiff complains about several incidents that occurred while she was assigned to BARJ, as described below.

### A.      The Anthony Brooks Incident

Sometime in 2016, plaintiff and one of her supervisors, Acting Supervisory Probation Officer Stephanie Lea, saw a CSSD-affiliated mentor, Anthony Brooks, behaving inappropriately with a 14-year-old juvenile.  *Id.* ¶ 24.  Plaintiff reported her concerns to several people, including her "immediate supervisor[]," *id*. ¶ 17, Supervisory Probation Officer Lawrence Weaver, *id. ¶* 24, and Shelia Roberson-Adams, the Program Manager/Assistant Deputy Director for the entire Northeast Regional Office, *id*. ¶¶ 17, 24.  For her part, Lea "wrote a memorandum documenting her concerns about Mr. Brooks' inappropriate actions."  *Id*. ¶ 24.  According to plaintiff, those concerns fell on deaf ears.  *Id*.  Indeed, after Lea authored her memorandum, she was demoted and replaced.  *Id*.

---

plaintiff received "Final Determination" of her termination on November 26, 2018); *id*. ¶ 75 (noting that following appeal of her termination "a final decision on Plaintiff's termination was issued on May 15, 2019").

In "August or September 2017," plaintiff received a call from the father of the juvenile with whom plaintiff had witnessed Brooks acting inappropriately. *Id*. ¶ 25. The father reported that Brooks had engaged in "sexual conduct" with his daughter. *Id*. Not long after, in September 2017, Brooks was arrested and charged with "criminal offenses involving sexual abuse of a minor." *Id*. As Brooks' prosecution began, Terri Odom, CSSD's Director, instructed plaintiff not to cooperate voluntarily with the authorities. *Id*. ¶¶ 15, 26. In October 2017, plaintiff received a subpoena from the Office of the United States Attorney for the District of Columbia directing her to meet with the Assistant United States Attorneys ("AUSAs") prosecuting Brooks' case. *Id*. ¶ 27. Plaintiff alerted her supervisor Weaver, who explained that, if she wanted, someone from the Superior Court's general counsel's office would accompany her to any meeting with the prosecuting authorities. *Id*. Plaintiff declined and told Weaver "that she was comfortable meeting with the AUSA without the Court's general counsel present." *Id*. ¶ 28. Plaintiff alleges that this did not sit well with Odom, who "angrily told Plaintiff that she did not like how Plaintiff had handled the situation," and ordered plaintiff to "report to the Court's general counsel's office the next day to provide a full accounting of the information that she had provided" to the authorities. *Id*. Plaintiff did so.[2] Nevertheless, plaintiff claims Odom "several times expressed" dissatisfaction over plaintiff's cooperation with prosecuting authorities and informed plaintiff that "the Brooks criminal proceedings reflected poorly on the [Superior] Court and the CSSD in particular." *Id*. ¶ 31.

The investigation was a source of tension between plaintiff and Odom, and contributed to plaintiff's medical problems as well. Specifically, plaintiff alleges that she suffers from "post-traumatic stress disorder" ("PTSD") as a result of sexual abuse she suffered as a child and later

---

[2]      In May 2018, plaintiff received a second subpoena, this time directing her to testify at Brooks' trial. Compl. ¶ 30. That trial never occurred, as Brooks apparently pled guilty. *Id*.

as an adult in 2006. *Id*. ¶ 9. Plaintiff claims that, upon learning of the sexual abuse involved in

the Brooks incident, she "began experiencing issues with her PTSD, including anxiety,

depression, panic attacks and headaches." *Id*. ¶ 32.

  **B.**  **Plaintiff's Supervisor Makes Inappropriate Sexual Comments**

  Plaintiff's problems at work were not limited to the Brooks investigation. In November

2017, her "immediate supervisor[]," *id*. ¶ 17, Weaver engaged plaintiff in conversation while the

two were at work, *id*. ¶ 34. Unsolicited, Weaver told plaintiff that he had begun having sex with

prostitutes when he was in the military and, after being married, he continued to have sex with

prostitutes. *Id*. Plaintiff was "shocked and offended" and told Weaver that "his comments were

inappropriate and left his presence." *Id*. According to plaintiff, this was not the first time

Weaver had "ma[de] . . . inappropriate remarks about females" in her presence. *Id*. ¶ 33. For

instance, plaintiff recalls Weaver saying in a 2016 meeting that, to break up a fight between two

female juveniles, he "had to slam that bitch." *Id*. Plaintiff also asserts that on another occasion,

as CSSD staff attempted to restrain a female juvenile, Weaver stated "[y]ou are a bunch of

pussies." *Id*. According to plaintiff, Weaver's November 2017 comments about sex with

prostitutes triggered symptoms of her PTSD, causing "anxiety, depression, panic attacks and

headaches." *Id*. ¶ 35.

  A few months later, in January 2018, plaintiff was off duty when she received a call from

Weaver asking her to accompany him as he dropped off a juvenile. *Id*. ¶ 36. "[A]nxious and

worried" on account of Weaver's November 2017 comments, plaintiff refused and told Weaver

that "she was off duty and," in any event "she had another commitment." *Id*. Weaver responded

that she was being "insubordinate." *Id*. Shortly thereafter, plaintiff discussed the incident with

another of her "immediate supervisors," Acting Supervisory Probation Officer Lisa McCants, *id*.

¶¶ 17, 37.  Plaintiff explained to McCants why she had declined Weaver's request to join him and specifically described Weaver's November 2017 conversation and that she now "felt very uncomfortable working with him."  *Id.* ¶ 37.  She also divulged that "Weaver's comments were causing issues with her PTSD and anxiety," *id.* ¶ 38, and ultimately "requested a transfer from under [Weaver's] supervision."  *Id.* ¶ 37.  McCants responded by assuring plaintiff that "she was a good, valued employee" and that "she could report to her, rather than" Weaver.  *Id.* ¶ 38.  Although "McCants told plaintiff that she would speak to . . . Weaver about his behavior," plaintiff alleges that McCants "attempted to excuse or minimize" his comments.  *Id.*  According to plaintiff, McCants did not report Weaver's conduct to Assistant Deputy Director Roberson-Adams and "no effective corrective actions were taken."  *Id.*  In fact, plaintiff asserts that Weaver "[s]ubsequently . . . continued to make inappropriate comments that were sexual in nature."  *Id.*

## C.    A New Health Condition Causes Plaintiff's Increased Absences

Plaintiff's work issues were compounded when, in January 2018, she was diagnosed with adenomyosis.  *Id.* ¶ 39.[3]  According to plaintiff, adenomyosis is "a debilitating physical condition that affects multiple physical and mental activities, including, but not limited to, walking, sitting, lifting, breathing and working."  *Id.* ¶ 8.  The condition "causes severe pain that adversely affects Plaintiff's ability to work, focus and concentrate."  *Id.*  In March 2018, two months after plaintiff's diagnosis, she informed McCants that she suffered from adenomyosis

---

[3]     Both plaintiff in her complaint and defendant in its briefing consistently refer to "andeomyosis."  *See, e.g.*, Compl. ¶ 8; Def.'s Mem. of Points & Auths. Supp. Def.'s Mot. ("Def.'s Mem."), at 3, ECF No. 7.  In plaintiff's charge of discrimination submitted to the Equal Employment Opportunity Commission ("EEOC"), however, she explains that "adenomyosis" is among her disabilities.  Def.'s Mot., Ex. 1 at 2, ECF No. 7-1.  The spelling in plaintiff's EEOC charge appears to be correct and is thus used throughout this opinion.  *Compare Adenomyosis, Merriam-Webster.com Medical Dictionary*, https://www.merriam-webster.com/medical/adenomyosis (last visited Aug. 3, 2020), *with Andeomyosis, Merriam-Webster.com Medical Dictionary*, https://www.merriam-webster.com/medical/andeomyosis ("The word you've entered isn't in the medical dictionary.") (last visited Aug. 3, 2020).

and described its effects.  *Id.* ¶ 39.  One day, in May 2018, plaintiff was experiencing "severe pain from her" adenomyosis, so she called in sick "[c]onsistent with CSSD practices."  *Id.* ¶ 40. The same day, Robert Smith, a male probation officer with no disabilities failed to appear for his shift without reporting sick or requesting a day off.  *Id.*  Plaintiff alleges that Weaver rebuked and criticized her for calling in sick but did not discipline Smith in any way.  *Id.*

The next month, on June 2, 2018, plaintiff and a male co-worker were on duty at BARJ. As no youth were present at the facility that day, plaintiff and her co-worker asked McCants for permission to leave early.  *Id.* ¶ 42.  McCants responded "okay," and plaintiff and her co-worker left for the day.  *Id.*  On July 12, 2018, however, Weaver recommended a 10-day suspension for plaintiff's actions on June 2, without recommending a suspension for her co-worker.  *Id.* ¶ 43. On August 7, 2018, plaintiff appealed the proposed suspension to CSSD Director Odom.  *Id.* ¶ 44.  At a meeting one week later with Odom and McCants about the proposed suspension, plaintiff told both supervisors about her disabilities, which she explained were the reason she was frequently reporting off from work.  *Id.* ¶ 45.  She also told McCants and Odom that her PTSD had been exacerbated by Weaver's November 2017 comments about prostitutes and that her physician had recommended that she take FMLA leave.  *Id.*  During the meeting, Odom agreed to lower the proposed suspension to a letter of reprimand.  *Id.*

Following that meeting, in mid-August 2018, plaintiff asked for the appropriate forms to request intermittent FMLA leave, which she and her physician completed in early September of that year.  *Id.* ¶¶ 46–47.  After she submitted the completed forms, plaintiff was approved for "continuous and intermittent FMLA leave."  *Id.* ¶ 47.

On August 25, 2018, plaintiff again met with Odom and McCants, but this time both Weaver, and CSSD Deputy Director Malcolm Woodland were also present.  *Id.* ¶ 48.  While the

complaint is unclear as to what precipitated this meeting, plaintiff explains that she told all of the

staff present about Weaver's November 2017 comments and that she found them "offensive and

unwelcome."  *Id*.  Plaintiff noted that she had reported Weaver's conduct to McCants in January

2018, and McCants acknowledged receiving this report but admitted that she had never spoken

to him about his conduct, despite having promised to do so.  *Id*.  In plaintiff's telling, Odom was

unimpressed and "blandly told Plaintiff that she and . . . Weaver needed to find a way to get

along."  *Id*.

### D.    The Juvenile Incident and Plaintiff's Termination

On September 19, 2018, both plaintiff and Weaver were on duty at BARJ when Weaver,

"without provocation or explanation," threw a stress ball at a 13-year-old female juvenile whom

plaintiff calls "JN."  *Id.* ¶ 49.  This caused JN to become "highly agitated."  *Id.* ¶ 50.  After

dinner that evening, JN "demanded a second juice box" from plaintiff.  *Id.* ¶ 51.  When plaintiff

told her that she could not have a second juice box, JN ignored her and took one from the cooler

anyway.  *Id*.  Plaintiff asked JN repeatedly to return the juice box and not to open it.  *Id.* ¶ 52.  JN

ignored these directions, too.  *Id*.  She "opened the juice box and advanced aggressively to hit

Plaintiff."  *Id*.  Plaintiff attempted to restrain JN by holding her wrist and simultaneously reached

around JN's shoulder to attempt to grab the juice box.  *Id*.  JN squeezed the juice box in

plaintiff's face and ran away down a hallway.  *Id*.  She tripped as she was running and was

"restrained by [a] Court security officer."  *Id.* ¶ 53.  Plaintiff felt that she had been assaulted and

"asked the Court security to detain JN and to call" the police to report the assault.  *Id*.  Officers

arrived at the scene and plaintiff described what had happened.  *Id.* ¶ 54.  She was asked to report

to the District of Columbia's Office of the Attorney General ("OAG") the next day for a follow-

up interview.  *Id.* ¶ 55.  JN was taken into custody.  *Id.* ¶ 54.  Before she left BARJ that night,

plaintiff sent an e-mail to both Weaver and McCants informing them of the incident.  *Id*. ¶ 57. The next day, plaintiff "prepared an incident report" and sent it to both McCants and Weaver. *Id*.  She also reported to OAG as directed by police officers the night before and again "truthfully recounted the previous evening's events."  *Id*. ¶ 58.

Neither McCants nor Weaver discussed the JN incident with plaintiff until September 25, when she met with McCants, Weaver, and Roberson-Adams.  *Id*. ¶¶ 60–61.  At the meeting, plaintiff described in detail her actions during the JN incident while Roberson-Adams asked questions and, according to plaintiff, listened only "partially."  *Id*. ¶ 61.  Although plaintiff explained how she had held JN's wrist in order to keep JN from hitting her and how she had reached around JN's shoulder in an effort to retrieve the juice box in her hand, "Roberson-Adams apparently failed to capture that explanation in the notes that she was entering in her laptop computer."  *Id*.

That evening, after the meeting had concluded, Roberson-Adams sent plaintiff follow-up questions via e-mail, many of which plaintiff felt she had already answered at the meeting.  *Id*. ¶ 62.  The message was sent to plaintiff's work e-mail address.  *Id*.  Plaintiff called in sick on both September 26 and 27 owing to "cramping from her [adenomyosis], anxiety and panic attacks," and, consequently, missed both Roberson-Adams' September 25 e-mail and another e-mail Roberson-Adams sent on September 27.  *Id*. ¶¶ 63–64.  On her return to work on September 28, 2018, plaintiff saw Roberson-Adams' e-mails for the first time, but did not respond.  *Id*. ¶ 65. During her shift that day, Weaver "questioned her about her whereabouts" and "interrogated" her about an entry she had made in a Superior Court computer system on September 26, when she was supposedly on sick leave.  *Id*.  Weaver also "expressed doubts that Plaintiff accurately had recorded her activities" in that same system for work she completed on September 20, 2018.  *Id*.

8

Plaintiff explained that her entries were accurate.  *Id.*  Following what plaintiff calls Weaver's "baseless accusations," she became ill and reported off as sick for the remainder of her shift.  *Id.*

The next day, September 29, 2018, while plaintiff was on duty at BARJ, Roberson-Adams demanded plaintiff send her written answers to the questions in her September 25 e-mail. *Id.* ¶ 67.  Plaintiff did not respond to the e-mail until October 1, 2018.  *Id.* ¶ 68.  Roberson-Adams responded "expressing skepticism concerning[] Plaintiff's explanations."  *Id.*  That same day, plaintiff met with CSSD Director Odom to discuss the JN incident.  *Id.*  ¶ 69.  Plaintiff asserts that Odom showed her video of the incident which "verified" plaintiff's account of events.  *Id.*  Nonetheless, "Odom accused Plaintiff of assaulting JN," a charge which plaintiff "adamantly denied."  *Id.*  Plaintiff complained that she had been "provided no training on how to de-escalate situations involving belligerent, non-compliant juveniles."  *Id.*  Indeed, according to plaintiff, she and other probation officers had "frequently . . . pleaded with CSSD managers to be provided training and written policies and procedures to enable them to better manage juveniles' behavior," especially in "situations involving non-compliant and aggressive juveniles."  *Id.* ¶ 22.

Ultimately, on October 9, 2018, plaintiff was issued a letter of reprimand.  *Id.* ¶ 70. Moreover, plaintiff was "assessed two . . . hours of AWOL" for leaving work early back on June 2, 2018.  *Id.*  On October 22, Roberson-Adams recommended plaintiff's termination and, on October 24, Odom issued a notice of intent to recommend termination.  *Id.* ¶¶ 71–72.  Plaintiff responded on October 31 "disput[ing] vigorously the basis for her proposed termination," but nevertheless received a "Final Determination" terminating her employment on November 26, 2018.  *Id.* ¶¶ 73–74.  Plaintiff appealed her termination and was given an evidentiary hearing on March 25 and 27, 2019, but to no avail.  *Id.* ¶ 75.  Her termination was affirmed on May 15, 2019.  *Id.*

As her internal appeal of her termination was pending, plaintiff filed a charge of discrimination with the EEOC on January 7, 2019.  *Id.* ¶ 76; *see also* Def.'s Mot., Ex. 1 ("EEOC Charge"), ECF No. 7-1.[4]  On her EEOC charge cover sheet, plaintiff marked boxes indicating that she was charging "discrimination based on" sex, disability, and retaliation.  EEOC Charge at 1.  The EEOC chose not to take action and plaintiff received a "Dismissal and Notice of Rights" from the EEOC on July 3, 2019.  Compl. ¶ 6.  On October 1, 2019, plaintiff filed the instant suit alleging (1) discrimination on the basis of her sex (Count I), *id.* ¶¶ 85–92; (2) retaliation in violation of Title VII (Count II), *id.* ¶¶ 93–101; (3) discrimination on the basis of her disabilities (Count III), *id.* ¶¶ 102–09; (4) retaliation in violation of the ADA (Count IV), *id.* ¶ 110–21; and (5) interference with the exercise of her FMLA rights (Count V), *id.* ¶ 122–29.  She requests, *inter alia*, $300,000 in damages.  *Id.* at 25.  As noted, pending before the Court is defendant's motion to dismiss Counts II, III, and IV, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  *See* Def.'s Mem. of Points & Auths. Supp. Def.'s Mot. ("Def.'s Mem."), ECF No. 7.  That motion is now ripe for review.

## I.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the

---

[4]  At the motion to dismiss stage, consideration of "matters outside the pleadings" typically requires that the motion instead be "treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(b)(6).  That conversion, however, is not triggered by consideration of "documents incorporated into the complaint by reference [or] matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). As defendant points out, and plaintiff does not contest, the charge of discrimination plaintiff filed with the EEOC is "incorporated by reference into the complaint," Def.'s Mem. at 1 n.1, and thus may be considered in resolving the pending motion for partial dismissal.

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). In deciding a motion under 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. Courts do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alteration in original) (internal citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

## II.    DISCUSSION

Defendant moves to dismiss plaintiff's claim, in Count II, that she was the victim of "unlawful retaliation in violation of . . .Title VII," Compl. at 20 (capitalization altered); her claim, in Count III, that she suffered "discrimination in violation of . . . the ADA," *id*. 21 (capitalization altered); and her claim, in Count IV, that she was the victim of "unlawful retaliation in violation of . . . the ADA," *id*. at 22 (capitalization altered). As the analytical framework for defendant's bid to dismiss Counts II and IV are nearly identical, those two counts are discussed first, before turning to Count III.

### A.    Count II Survives

Title VII's retaliation provision makes "unlawful" action by an "employer to discriminate against" an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Phrased disjunctively, Title VII thus protects two kinds of conduct from an employer's retaliatory acts: (1) opposition to "practice[s] made" unlawful by Title VII; and

(2) "participat[ion] in any manner" in proceedings related to Title VII.  *Id.*  To maintain a retaliation claim successfully, plaintiff "must show" that (1) she "engaged in" one of those two kinds of "statutorily protected activit[ies]"; (2) that she "suffered a materially adverse action" at defendant's hands; and (3) that a "causal link connects" the protected activity and the adverse action.  *Howard R. L. Cook & Tommy Shaw Found. ex rel. Black Emps. of the Lib. of Cong. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013).  At the motion to dismiss stage, plaintiff's "complaint must 'contain sufficient factual matter, accepted as true,' to plausibly establish those three elements."  *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Defendant asserts that plaintiff's complaint falls short of establishing the first and third elements.  According to defendant, (1) "plaintiff has not alleged any protected activity under Title VII," Def.'s Mem. at 7 (capitalization altered); and (2) in any event, "plaintiff has not alleged a causal connection between any allegedly protected act and her reprimand or termination," *id.* at 11 (capitalization altered).  Each of defendant's challenges to Count II is addressed in turn.

### 1.    Plaintiff Has Adequately Alleged Protected Conduct under Title VII

To satisfy the first element of her retaliation claim, plaintiff maintains that both Odom and Roberson-Adams recommended her termination in retaliation for "opposing unlawful employment practices and participating in" what she terms "EEO activities."  Compl. ¶ 95.  Specifically, plaintiff says she was fired because she "participat[ed] in the Brooks criminal investigation and oppos[ed] . . . Weaver's offensive and harassing sexual comments about prostitutes."  *Id.* ¶ 94.  She also notes that she "engaged in further protected activities when she filed her Charge of Discrimination with the EEOC."  *Id.* ¶ 97.

Defendant first takes issue with plaintiff's allegation that she "engaged in protected activities" when she "participat[ed] in the Brooks criminal investigation." *Id.* ¶ 94. In defendant's view, Brooks' actions were not practices "made unlawful by" by Title VII and, moreover, the investigation into his misconduct was not "an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a); *see also* Def.'s Mem. at 8–9. No matter how vociferously plaintiff opposed Brooks' conduct and no matter how active she was in the investigation into his misdeeds, defendant argues that such opposition and participation could not trigger Title VII's retaliation provisions. Plaintiff does not respond to this argument and has therefore conceded that her participation in the investigation of and opposition to Brooks' conduct were not protected activities. *See* Pl.'s Opp'n at 15 (focusing entirely on plaintiff's "vociferous[] oppos[ition to] what she considered inappropriate sexual comments and harassment by . . . Weaver"); *see also Damarcus S. v. Dist. of Columbia*, 190 F. Supp. 3d 35, 48 (D.D.C. 2016) (explaining that when a party "does not respond to [an] argument," the argument is "deemed conceded" (citing *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829 (D.C. Cir. 1997)).

Remaining, then, is defendant's argument that plaintiff's conduct following Weaver's November 2017 comments does not constitute protected activity under Title VII. Defendant's challenge in this regard is difficult to pin down. Initially, defendant relegates to a footnote the argument that plaintiff's allegations are insufficient because she did "not allege that she believed, much less stated, that Weaver's isolated comments constituted any type of unlawful discrimination." Def.'s Mem. at 9 n.5. Following plaintiff's concession that her participation in the Brooks investigation did not trigger Title VII's retaliation protection, defendant's focus shifted to plaintiff's opposition to Weaver's comments. In reply, defendant again argues that plaintiff's allegations are insufficient because she "never alleged she believed that Weaver's

isolated comments violated Title VII, much less that she told Weaver or anyone else that she believed they did." Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply"), at 2, ECF No. 10.  In addition, defendant asserts that, even if plaintiff had expressed her subjective belief that she was opposing conduct made unlawful by Title VII, she had "not alleged specific facts that, if true, would show that" her belief was reasonable.  *Id.* at 3.  Defendant thus appears to mount a two-pronged attack on this aspect of plaintiff's complaint: (1) plaintiff has failed to allege she believed she was opposing a Title VII violation and failed to tell anyone that she believed Weaver's conduct violated Title VII; and (2) even if she had, her subjective belief that Weaver's comments violated Title VII was unreasonable.

Defendant's apparent contention that, in order to constitute protected activity, plaintiff was required to voice her belief that Weaver's comments violated Title VII finds no support in fact or, for that matter, in law.  Indeed, the Supreme Court has made clear that "ostensibly disapproving account[s] of sexually obnoxious behavior" are "covered by the opposition clause" of Title VII's retaliation provision.  *Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009).  Plaintiff in this case alleges that she gave just such "disapproving account[s]" of what she perceived to be "sexually obnoxious behavior" on no less than three occasions.  *Id.*  In January 2018, plaintiff told McCants that after "her November 2017 conversation" with Weaver about his activities with prostitutes, "she felt very uncomfortable working with him and requested a transfer."  Compl. ¶ 37.  On August 14, 2018, when plaintiff met with McCants and Odom after Weaver had recommended her suspension, she told them both that her PTSD symptoms had been exacerbated by Weaver's comments.  *Id.* ¶ 45.  Finally, in a meeting with McCants, Odom, Weaver, and CSSD Deputy Director Woodland on August 25, 2018, plaintiff again "described [Weaver's] November 2017 comments" and expressed that she

14

found the comments both "offensive and unwelcome." *Id.* ¶ 48.  Defendant may be right that

plaintiff nowhere alleges that she said the magic words "I believe Weaver's comments violated

Title VII," but nothing in Title VII required her to do so.  *Cf. Crawford*, 555 U.S. at 277 (noting

that merely "standing pat, say, by refusing to follow a supervisor's order to fire a junior worker

for discriminatory reasons" would constitute opposition).  She need only have expressed her

opposition to the conduct, which she adequately alleges she did by repeatedly complaining to her

superiors that she found Weaver's comments "offensive and unwelcome."  Compl. ¶ 48.

Defendant's second contention that even if plaintiff believed she was opposing unlawful

conduct, her belief was unreasonable, is similarly unavailing.  Although the opposition clause of

Title VII's retaliation provision states that it protects only employees who have "opposed [a]

practice made an unlawful employment practice" by Title VII, 42 U.S.C. § 2000e-3(a), the D.C.

Circuit has "interpreted this phrase as extending to a practice that the employee reasonably and

in good faith believed was unlawful under the statute," even if the practice was not actually a

violation of the anti-discrimination law, *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir.

2012) (emphasis omitted) (citing *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) and

*Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981)).  If, however, the

practice a plaintiff opposes "is not one that could reasonably and in good faith be regarded as

unlawful under Title VII, this element is not satisfied."  *Id.* (citing *Clark Cnty. Sch. Dist. v.

Breeden*, 532 U.S. 268, 271 (2001)).  Defendant maintains that "[e]ven if Plaintiff found

Weaver's November 2017 statements about prostitutes offensive," it was not reasonable to

believe that those comments constituted a violation of Title VII.  Def.'s Reply at 2–3.

Defendant relies on *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), in which case a

black woman alleged that her co-workers "made insulting and demeaning statements to her,"

including telling her "go back to Trinidad" and to "go back to where [she] came from." *Id*. at

408 (alteration in original).  The woman reported each of these incidents to her supervisor. *Id*.

She was ultimately terminated. *Id*. at 409.  She sued, claiming, *inter alia*, that she had been

subjected to a hostile work environment and that she had been retaliated against for making her

complaints.  On summary judgment, the Circuit rejected both claims. *Id*. at 416–17.  First

addressing her hostile work environment claim, the Circuit explained that, although Title VII is

violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment," no such violation occurs unless the allegedly

harassing conduct is truly "extreme." *Id*. at 416 (first quoting *Oncale v. Sundowner Offshore

Servs., Inc.*, 523 U.S. 75, 78 (1998), then quoting *Faragher v. City of Boca Raton*, 524 U.S. 775,

788 (1998)).  Indeed, "simple teasing, offhand comments, and isolated incidents (unless

extremely serious) will not amount to" Title VII violations. *Id*. (quoting *Faragher*, 524 U.S. at

788).  The Circuit determined that the allegedly harassing acts about which the plaintiff

complained were "[a]t best . . . exactly the sort of 'isolated incidents' that the Supreme Court has

held cannot form the basis for a Title VII violation." *Id*. at 417.  Moving on to her retaliation

claim, the Circuit held that "the incidents of which [the plaintiff] complained could not

reasonably be thought to constitute an abusive working environment in violation of Title VII,"

and her retaliation claim was thus doomed. *Id*.

　　　　Defendant's reliance on *George* is misplaced.  That case was an appeal from the grant of

summary judgment, a far different procedural posture than this one.  In the employment

discrimination context, the Supreme Court has time and again cautioned against allowing the

"evidentiary standard[s]" used to evaluate motions for summary judgment like the one at issue in

*George*, to morph into "rigid pleading standard[s]" at the motion to dismiss stage. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002). While a summary judgment plaintiff may be required to "establish[] a prima facie case" of discrimination, *id.* at 511, which, for retaliation claims includes "showing . . . that [she] engaged in statutorily protected activity," *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009), a plaintiff resisting a motion to dismiss need not "establish" anything. At the motion to dismiss stage, a plaintiff need only plead facts that could "plausibly" establish the elements of a retaliation claim. *Billington*, 737 F.3d at 772. This sets the instant inquiry apart from the one the Circuit undertook in *George*, which was uninterested in the plausibility of the plaintiff's claims, but rather asked whether the elements of a prima facie case had in fact been established.

The relevant standard here is far less exacting. Plaintiff's complaint need not establish that the conduct she opposed was unlawful. Since one way to engage in protected activity is to oppose "a practice that [she] reasonably and in good faith believed was unlawful" under Title VII, *McGrath*, 666 F.3d at 1380 (emphasis omitted), the question to be answered on the instant motion is: Has plaintiff alleged "sufficient factual matter, accepted as true," *Iqbal*, 556 U.S. at 678, plausibly to establish the reasonableness of her belief regarding Weaver's comment violating Title VII?

The answer to that question is "yes." Plaintiff explains that she considered Weaver's November 2017 comments about his exploits with prostitutes to be "inappropriate" and expressed her belief that the comments amounted to "harassment by her immediate supervisor." Pl.'s Opp'n at 15. Plaintiff thus appears to suggest that Weaver's comments created a hostile work environment in violation of Title VII. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("[A] plaintiff may establish a violation of Title VII by proving that discrimination

based on sex has created a hostile or abusive work environment."). Defendant attempts to brush

off the incident as merely a single "offensive utterance" that fails to "satisfy Title VII's

demanding standard" to establish a hostile work environment. Def.'s Reply at 2 (quoting

*George*, 407 F.3d at 416). True enough, "cases in which a single incident can create a hostile

work environment are rare[,] . . . [b]ut saying that a single incident of workplace conduct *rarely*

can create a hostile work environment is different from saying that a single incident *never* can

create a hostile work environment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir.

2013) (emphasis in original) (Kavanaugh, J., concurring). As already explained above,

moreover, plaintiff need not establish or even plausibly allege that Weaver's comments fall in

the narrow class of meritorious single-incident hostile work environment claims. Instead, she

need only allege facts to establish that her belief those comments violated Title VII was plausibly

reasonable. Plaintiff has alleged that her immediate supervisor, unsolicited, regaled her with

stories of his past and ongoing exploits with prostitutes. That she might reasonably and in good

faith believe that such an incident was "sufficiently severe" so as to "create a hostile work

environment" is doubtless plausible. *Id.* Plaintiff has thus done enough to allege that she

engaged in activity protected by Title VII's retaliation provision.

### 2. Plaintiff Has Adequately Alleged a Causal Connection between Her Title VII Protected Activity and Her Termination

Defendant next takes aim at the third element of a Title VII retaliation claim: whether

plaintiff has plausibly alleged that a "causal link connects" her protected activity and the adverse

action she suffered. *Billington*, 737 F.3d at 772. Specifically, defendant contends that the

adverse actions suffered by plaintiff are too temporally "remote" from her protected activities

and plaintiff has failed to allege any "other causal connection." Def.'s Mem. at 11–12. Plaintiff

responds that "there was close temporal proximity between [her] protected activities and the

materially adverse actions taken against her," and even if not, "there are additional indicia of causality" contained in her complaint.  Pl.'s Opp'n at 17–18.

"It is well established that evidence of a pattern of antagonism following closely on the heels of protected activity and related to the challenged employment action may establish the causation element of a Title VII plaintiff's" retaliation claim.  *Allen v. Johnson*, 795 F.3d 34, 46 (D.C. Cir. 2015) (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357–59 (D.C. Cir. 2012)).  The precise point in time when an adverse action becomes too temporally remote to, on its own, raise an inference of causation is not fixed.  Nevertheless, "the Supreme Court has recognized that the cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close" and cited "approvingly cases where three- and four-month intervals were found insufficient."  *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (internal quotation marks and alteration omitted) (quoting *Breeden*, 532 U.S. at 273).

In order to measure the temporal proximity between plaintiff's protected activities and the adverse actions she allegedly suffered, the dates of each must be determined.  As discussed above, plaintiff has adequately alleged that she engaged in protected activities on three occasions.  First in January 2018, Compl. ¶ 37, next on August 14, 2018, *id*. ¶ 45 and finally on August 25, 2018, *id.* ¶ 48.  The parties dispute, however, which actions taken by plaintiff's superiors were "materially adverse."  *Billington*, 737 F.3d at 772; *compare* Def.'s Mem. at 11 (identifying "four allegedly retaliatory acts" all occurring in "October and November 2018") *with* Pl.'s Opp'n at 17 (explaining that plaintiff's superiors "rebuked [her] in May 2018," *see* Compl. ¶ 40, "recommended her for a 10-day suspension on July 12, 2018," *see id.* ¶ 43, and then recommended and effectuated her termination in October and November of 2018).  They

agree, or at least do not dispute, that when plaintiff was "issued a letter of reprimand" on October 9, 2018, she suffered an adverse action.  Def.'s Mem. at 11; Pl.'s Opp'n at 17.  Two of plaintiff's alleged protected activities thus occurred less than two months prior to an action the defendant concedes was adverse.  *See Hamilton*, 666 F.3d at 1358 (indicating that it is the protected activity that occurs latest in time that matters for the calculation of temporal proximity).  Plaintiff's superiors recommended her termination not long after that reprimand, Compl. ¶¶ 71–72, and her termination was completed a few weeks later, *id*. ¶ 74.

The temporal proximity between protected activity and adverse action alleged in plaintiff's complaint could plausibly establish a causal link between the two.  Indeed, a two-month gap between protected activity and a defendant's "first step toward [an] adverse action" was held to be sufficient to meet a plaintiff's summary judgment burden in a retaliation case. *Hamilton*, 666 F.3d at 1358–59.  If a showing "is sufficient to satisfy a plaintiff's burden of establishing a prima facie case at the summary judgment stage," that showing "is certainly enough to survive a motion to dismiss."  *Harris v. Dist. of Columbia Water & Sewer Auth.*, 791 F.3d 65, 69 (D.C. Cir. 2015) (citing *Swierkiewicz*, 534 U.S. 506).

Even if the two-month period between plaintiff's complaints about Weaver's comments and her reprimand were not enough plausibly to establish causality, plaintiff's complaint contains other allegations that buttress a potential causal link.  For instance, plaintiff alleges that "[d]uring her tenure as a" probation officer, her "performance frequently was rated as 'Exceeds Expectations' and Plaintiff never was rated as less than 'Commendable.'"  Compl. ¶ 13.  She also alleges that she was told "she was a good, valued employee."  *Id.* ¶ 38.  Such allegations are circumstantial evidence of causation because they plausibly discredit one of the "most common legitimate reasons for termination: performance below the employer's legitimate expectations."

*Harris*, 791 F.3d at 69 (internal quotation marks omitted) (quoting *George*, 407 F.3d at 412). Moreover, plaintiff's complaint contains a list of three male co-workers who, she alleges, did not engage in protected activities.  According to plaintiff, when these individuals assaulted juveniles in their care—as plaintiff was alleged to have done—none were disciplined.  Compl. ¶ 78.  These comparators also help to make out a plausible causal link, because, if they are accepted as true, they cast doubt on another possible legitimate reason for plaintiff's termination, namely the incident with JN.

***

Count II of plaintiff's complaint adequately alleged both that she engaged in protected activities and a causal link between those activities and her reprimand and termination.  Given that defendant does not dispute that plaintiff suffered an adverse action, her complaint contains "sufficient factual matter, accepted as true, to plausibly establish" the three elements of a retaliation claim.  *Billington*, 737 F.3d at 772.  Plaintiff has thus done enough to shepherd Count II of her complaint past defendant's motion to dismiss.

### B.    Count IV Survives

Count IV of plaintiff's complaint alleges that she suffered "unlawful retaliation in violation of the . . . ADA."  Compl. at 22 (capitalization altered).  Like Title VII, the ADA contains a retaliation provision.  Also like Title VII, the ADA's retaliation provision makes it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful" by the ADA or "because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA.  42 U.S.C. § 12203(a).  The three elements of an ADA retaliation claim are identical to those necessary to state a Title VII retaliation claim.  *See Smith v. Dist. of Columbia*, 430 F.3d

21

450, 455 (D.C. Cir. 2005) (listing the "three elements of a prima facie case of [ADA] retaliation"
as (1) the plaintiff has "engaged in protected activity"; (2) the plaintiff "was subjected to adverse
action by the employer"; and (3) "there existed a causal link between the adverse action and the
protected activity" (internal quotation marks and citation omitted)).

  With respect to her ADA retaliation claim, plaintiff asserts that, "[b]etween January 2018
and December 2018," she "oppose[d] the interference with her rights protected by the ADA by
informing" her superiors "of her protected disabilities, as well as [by] making formal and
informal complaints of disability discrimination to Defendant's representatives, including"
defendant's human resources office, Odom, Roberson-Adams, Weaver and McCants.  Compl.
¶ 111.  Defendant challenges the sufficiency of plaintiff's pleading of her ADA retaliation claim
on three grounds, contending that plaintiff (1) has not exhausted her ADA retaliation claim;
(2) has not adequately alleged that she engaged in protected activities; and (3) has failed to allege
a causal link between any alleged protected activity and the adverse employment action she
suffered.  Def.'s Mem. at 9–13.  Those challenges to Count IV are addressed *seriatim*.

### 1. Plaintiff Has Exhausted Her ADA Retaliation Claim

  Before a plaintiff may make an ADA claim in federal court, she "must exhaust [her]
administrative remedies by filing an EEOC charge and giving that agency a chance to act on it."
*Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (citing 42 U.S.C.
§ 12117(a) (explaining that the enforcement procedures applicable to Title VII claims also apply
to ADA claims)).  Plaintiff did so on January 7, 2019.  Compl. ¶ 5; *see also* EEOC Charge at 1.
Five months later plaintiff's EEOC charge was dismissed, Compl. ¶ 6, giving her the right to file
suit, 42 U.S.C. § 2000e-5(f)(1) (explaining that if an EEOC charge "is dismissed by the
Commission" the "person claiming to be aggrieved" may file suit "within ninety days" of

receiving notice of such dismissal).  An ADA lawsuit "following the EEOC charge," however,

"is limited in scope to claims that are "like or reasonably related to the allegations of the charge

and growing out of such allegations."  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)

(internal quotation marks omitted) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th

Cir. 1994)).  A claim is "reasonably related" to an EEOC charge if, "at a minimum" it would

"arise from the administrative investigation that can reasonably be expected to follow the charge

of discrimination."  *Haynes v. Dist. of Columbia Water & Sewer Auth.*, 924 F.3d 519, 526–27

(D.C. Cir. 2019).  This exhaustion requirement serves to "give the agency an opportunity to

resolve the claim administratively before the employee files her complaint in district court."  *Id*.

at 527 (internal quotation marks and alterations omitted) (quoting *Payne v. Salazar*, 619 F.3d 56,

65 (D.C. Cir. 2010)).

Defendant's argument that "[n]othing in the extensive declaration that Plaintiff filed with

her EEOC charge alleges retaliation for activities protected by the ADA," appears premised on

the assertion that plaintiff failed to allege adequately that she engaged in activities protected by

the ADA.  Def.'s Mem. at 13.  This misconstrues the exhaustion inquiry.  The question is not

whether plaintiff adequately alleged retaliation for activities protected by the ADA in her EEOC

charge, but rather whether the factual allegations in the EEOC charge would have set the EEOC

down the path to "uncover[ing] evidence relevant to [plaintiff's] . . . discrimination claims" in

any resulting investigation.  *Haynes*, 924 F.3d at 528.  There are several indications that

plaintiff's EEOC charge would have done just that.  For one, when the EEOC charge form asked

plaintiff for the basis of her charge of discrimination, she checked the boxes for "sex,"

"disability," and finally, "retaliation."  EEOC Charge at 1.  This immediately sets plaintiff's

charge apart from those at issue in cases relied on by defendant.  Def.'s Mem. at 13 (citing

*Jouanny v. Embassy of Fr. in the U.S.*, 280 F. Supp. 3d 3, 7 (D.D.C. 2017) (finding plaintiff failed to exhaust retaliation claim when she "marked the box for 'Age,' but not the box for 'Retaliation'") and *Grosdidier v. Chairman, Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 97 (D.D.C. 2011) (finding plaintiff did not exhaust a race discrimination claim when "she did not list race as a basis for her claims on her . . . EEO complaint")).

Moreover, plaintiff's EEOC charge contained the facts upon which she bases her ADA retaliation claim in the instant suit.  As explained in more detail below, plaintiff claims that she engaged in protected activity when "she disclosed her medical conditions to . . . McCants" and when she "requested an accommodation by requesting a transfer away from [Weaver's] supervision."  Pl.'s Opp'n at 16.  Defendant may disagree that these actions amounted to protected activity, but cannot deny that the EEOC charge contains nearly identical allegations.  EEOC Charge at 3 (Plaintiff declaring "I . . . told Lisa that I was having issues with my anxiety" and that "I felt uncomfortable working with Lawrence, and I wanted to transfer").  Although plaintiff's focus when she filed her charge may have been on the retaliation she believed she suffered "for complaining about [Weaver's] sexual comments," EEOC Charge at 5, her current ADA retaliation claim doubtless "grow[s] out of [the] allegations" in her EEOC charge, *Haynes*, 924 F.3d at 526 (quoting *Park*, 71 F.3d at 907).  She has thus exhausted her ADA retaliation claim.

### 2. Plaintiff Has Adequately Alleged Protected Activity under the ADA

As with the Title VII retaliation claim, defendant contends that plaintiff has failed to allege adequately that she engaged in conduct protected by the ADA's retaliation provision.  In the main, defendant takes issue with plaintiff's allegation that she engaged in protected activities

by "informing [her superiors] of her protected disabilities." Compl. ¶ 111.[5]  According to

defendant "[t]he ADA is clear that disclosing a medical condition is not a protected act."  Def.'s

Mem. at 10.  Plaintiff does not respond to this argument and has thus conceded her opportunity

to do so.  *Damarcus S.*, 190 F. Supp. 3d at 48.  Instead, plaintiff responds by arguing that she

engaged in protected activities when she "requested an accommodation by requesting a transfer

away from [Weaver's] supervision" in a January 2018 meeting with McCants.  Pl.'s Opp'n at

16.[6]

The D.C. Circuit has joined its "sister circuits in holding that the act of requesting in good

faith a reasonable accommodation is a protected activity under" the ADA.  *Solomon v. Vilsack*,

763 F.3d 1, 15 & n.6 (D.C. Cir. 2014) (collecting cases).  Plaintiff's allegations plausibly

establish that she made such a good faith request.  As she puts it, she told "McCants that . . .

Weaver's comments were causing issues with her PTSD and anxiety" and "requested a transfer

from under his supervision." Compl. ¶¶ 37–38.  The ADA defines "reasonable accommodation"

as including "job restructuring," "reassignment," and "other similar accommodations."  42

U.S.C. § 12111(9)(B).  A transfer from the supervision of an individual whose presence

exacerbates plaintiff's alleged disability could certainly constitute a reasonable accommodation.

---

[5]     Defendant also takes issue with plaintiff's allegation that she made "formal and informal complaints of
disability discrimination" to CSSD officials. Compl. ¶ 111.  Defendant claims that "the narrative portion of
[plaintiff's] complaint . . . does not mention any formal complaints of disability discrimination and says nothing
about when the alleged complaints were made or what specifically she complained about."  Def.'s Mem. at 10 n.6.
Plaintiff does not respond to this argument.  *See* Pl.'s Opp'n at 16.  Although plaintiff's complaint details numerous
occasions on which she "informed" her superiors of her alleged medical conditions, *see, e.g.*, Compl. ¶¶ 39, 45,
defendant is correct that nothing suggests plaintiff ever made a formal or informal complaint about disability
discrimination to CSSD staff.
[6]     Plaintiff suggests that she also requested an accommodation in an August 2018 meeting with Odom and
McCants, citing paragraph 45 of her complaint. Pl.'s Opp'n at 16.  That paragraph, however, indicates only that
plaintiff "informed . . . Odom and . . . McCants of her physical and mental conditions" and "explained that her
anxiety, depression and panic attacks, as well as her PTSD had been exacerbated by . . . Weaver's comments about
having sex with prostitutes."  Compl. ¶ 45.  Although she told Odom and McCants "that her physician
recommended that she take FMLA leave," this is not the same as requesting an accommodation for her alleged
disabilities during that meeting.  *Id.*

Defendant does not disagree, but instead takes issue with whether plaintiff's request was made in good faith by noting that, in her opposition brief, she includes the statement that she "has not alleged that [her medical] conditions can be ameliorated by effecting a transfer." Pl.'s Opp'n at 20. Plaintiff made this statement in response to the suggestion by defendant, described in more detail below, *see infra* Part III.C, that plaintiff's disabilities were *caused* by her workplace and that they "would abate if [she] worked somewhere else." Def.'s Mem. at 15 (quoting *Belton v. Snyder*, 249 F. Supp. 3d 14, 24–25 (D.D.C. 2017)). The context of plaintiff's statement thus clarifies that she was not arguing that a transfer would have been an ineffective accommodation, but was instead simply stating that a different job would not heal or resolve her PTSD. Nothing in plaintiff's filings calls into doubt plaintiff's good faith in making her transfer request.

Finally, defendant argues that plaintiff's contention that her transfer request was in fact a request for an accommodation is nothing more than an attempt to "amend her complaint in [her] opposition brief." Def.'s Reply at 3. To be sure, in describing Count IV, plaintiff focused on the fact that she "inform[ed] [her supervisors] of her protected disabilities" and "made formal and informal complaints of disability discrimination," but plaintiff's contention that she requested an accommodation does not *amend* her complaint, as it relies entirely on the factual allegations contained therein. Compl. ¶ 111. More clarity in her description of Count IV may have been desirable, but plaintiff's complaint, in describing her transfer request, has alleged sufficient factual matter, accepted as true, plausibly to establish that she engaged in ADA protected activities.

### 3. Plaintiff Has Adequately Alleged a Causal Link between Her Protected Conduct and an Adverse Action

Finally, defendant again takes aim at the existence of a causal link *vel non* between plaintiff's alleged protected activities and the adverse actions plaintiff suffered. As with

plaintiff's Title VII retaliation claim, defendant remains myopically focused on its perceived lack of temporal proximity.  *See* Def.'s Reply at 4.  The standard for determining whether an ADA complaint plausibly alleges a causal link between protected conduct and an adverse action is identical to the one applied to Title VII cases, so that ground need not be reploughed.  *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (explaining that the "anti-retaliation provisions" of Title VII and the ADA "are indistinguishable").  Plaintiff's single act of ADA protected activity is certainly more temporally remote to any potential adverse action than plaintiff's Title VII protected activities.  Her transfer request was made in January 2018, Compl. ¶ 37, and though defendant seems to concede that Weaver's recommended 10-day suspension in July 2018 was materially adverse, *see* Def.'s Reply at 4, that still leaves six months between the two events.  Nevertheless, as explained above, plaintiff's complaint contains more than a mere allegation of temporal proximity.  *See supra* Part III.A.2.  She also alleges that she received nothing but positive performance reviews and describes how similarly situated male employees who had not engaged in protected activities were not disciplined for their physical encounters with juveniles in their care.  *Id.*; *see also* Compl. ¶¶ 13, 78.

The lengthier temporal distance between plaintiff's ADA-protected activity and an adverse action may make her allegation of retaliation less likely, but it does not take the claim out of the realm of the plausible.  *Harris*, 791 F.3d at 69 (holding that a gap of five months, when pled alongside allegations that would help rebut "common legitimate reasons for" adverse actions was "enough to survive a motion to dismiss" (internal quotation marks omitted)).  Count IV of plaintiff's complaint survives defendant's motion to dismiss.

### C.      Count III Survives

Finally, defendant moves to dismiss Count III of plaintiff's complaint, which alleges that plaintiff was the victim of "discrimination in violation of . . . the ADA."  Compl. at 21 (capitalization altered).  Specifically defendant urges "this Court [to] dismiss Plaintiff's disability discrimination claim . . . because she has not alleged a qualifying disability."  Def.'s Mem. at 14.

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities . . . a record of such impairment; or . . . being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The kinds of major life activities that must be substantially limited in order for a disability to qualify "include, but are not limited to, . . . walking, standing, lifting, bending, . . . concentrating, thinking, communicating, and working."  *Id*. § 12102(2).  As evident from the statutory text, "[m]erely having an impairment does not make one disabled for purposes of the ADA.  Claimants also need to demonstrate that the impairment limits a major life activity."  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002) (overturned by statute on other grounds); *see also Haynes v. Williams*, 392 F.3d 478, 481–82 (D.C. Cir. 2004) ("[A] plaintiff is disabled under the ADA if: (1) he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial.").  At the motion to dismiss stage, plaintiff need not "demonstrate" that limitation, but plead facts, accepted as true, that could plausibly make that demonstration.

Plaintiff alleges that she has two disabilities.  First, she states that she has adenomyosis, which is a physical condition she alleges affects "multiple physical and mental activities, including, but not limited to, walking, sitting, lifting, breathing and working."  Compl. ¶ 8.  Her adenomyosis also "causes severe pain that adversely affects Plaintiff's ability to work, focus and

concentrate." *Id*.  Second, plaintiff alleges that she also "suffers from post-traumatic stress

disorder," which "stem[s] from childhood sexual abuse and a 2006 sexual assault by a dentist."

*Id*. ¶ 9.  As a result, she "regularly experiences anxiety, depression and panic attacks" that "affect

her ability to work, communicate, focus and concentrate."  *Id*.  As described above, her PTSD

"can be triggered by workplace stressors."  *Id*.

Defendant posits two reasons why plaintiff's complaint does not adequately allege a

qualifying disability.  First, according to defendant, "[p]laintiff offers nothing more than

conclusory descriptions of" her alleged disabilities "that copy the language of the ADA and its

implementing regulations."  Def.'s Mem. at 14.  Second, with respect to plaintiff's allegation of

PTSD, defendant maintains that "if workplace-specific stressors, such as her interactions with

her supervisor, exacerbate Plaintiff's post-traumatic stress disorder . . . , then Plaintiff does not

have a qualifying disability."  *Id*. at 15.  Defendant is wrong on both counts.

As to defendant's first reason, although plaintiff's description of which "major life

activities" her disabilities impact includes many from the list of representative examples

provided by the ADA, *compare* Compl. ¶¶ 8–9 *with* 42 U.S.C. § 12102(2)(A), her complaint is

replete with examples of how both her PTSD and adenomyosis "substantially limit[]" her ability

to engage in those activities.  42 U.S.C. § 12102(1)(A).  For example, after learning the details of

the Brooks incident, "Plaintiff began experiencing issues with her PTSD, including anxiety,

depression, panic attacks and headaches."  Compl. ¶ 32.  She began suffering similar symptoms

following Weaver's 2017 comments about his exploits with prostitutes.  *Id*. ¶ 35.  As for the

effects of her adenomyosis, "[i]n May 2018, Plaintiff was in severe pain" as a result of the

condition and was forced to call in sick to work.  *Id*. ¶ 40.  She was similarly unable to work on

September 26 and 27, 2018 owing in part to "cramping from her [adenomyosis]."  *Id*. ¶ 63.

Moreover, plaintiff alleges that she reported to Odom and McCants that both of her disabilities "were causing her to have to report off frequently from work." *Id.* ¶ 45. Far from conclusory, these specific examples of plaintiff's disabilities interfering with her ability to work substantiate her claim that those disabilities "substantially limit[] one or more major life activities." 42 U.S.C. § 12102(1).

Defendant's second reason—that plaintiff's PTSD is not a qualifying disability because the symptoms of that disorder are exacerbated by "workplace-specific stressors," Def.'s Mem. at 15—similarly fails. The cases on which defendant relies for that strange proposition, which is abandoned in reply, offer no support. Indeed, each of those cases considers circumstances in which an alleged disability was entirely *caused* by the plaintiff's specific workplace and would "abate if [the plaintiff] worked elsewhere." *Belton*, 249 F. Supp. 3d at 25; *see also Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66, 71 (D.D.C 2012) (plaintiff's "stress" that was "caused by events" at her workplace was not a qualifying disability). Here, by contrast, plaintiff does not allege that her PTSD is caused by her specific workplace, but that her PTSD, caused by childhood trauma and trauma she suffered outside of work, has made certain aspects of her job more difficult. Compl. ¶¶ 9, 45. Indeed, the most recent amendments to the ADA's definition of disability make clear that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). That workplace stressors trigger episodic symptoms of plaintiff's PTSD does not disqualify that disorder as a disability under the ADA. Moreover, EEOC regulations make clear that "it should be easily be concluded" that "post-traumatic stress disorder" is in the class of impairments that "will, at a minimum substantially limit . . . major life activities." 29 C.F.R. § 1630.2(j)(3)(iii). Just so.

In sum, neither of defendant's arguments for dismissal of Count III of plaintiff's complaint are availing.  Thus, Count III also survives this motion to dismiss.

## III.  CONCLUSION

For the foregoing reasons, defendant's partial motion to dismiss is denied.  An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  August 3, 2020

_____
BERYL A. HOWELL
Chief Judge