# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DENISE TENNANT, | |
| Plaintiff, | Civil Action No. 19-2949 (BAH) |
| v. | Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Denise Tennant, a former Probation Officer in the Court Social Services Division ("CSSD") of the Superior Court of the District of Columbia, has sued her former employer under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*., alleging discrimination and retaliation based on sex and her disabilities, and interference with her FMLA rights in a five-count complaint, *see* Compl., ECF No. 1.  Defendant moves for summary judgment on all counts, under Federal Rule of Civil Procedure 56(a), arguing that no genuine dispute of material facts exists.  *See* Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 32.  For the reasons explained below, defendant's motion is granted in part and denied in part.

## I.    BACKGROUND

The factual background of this case was initially described in denying defendant's motion to dismiss.  *See Tennant v. District of Columbia*, No. 19-cv-2949 (BAH), 2020 WL 4464505, at *1–5 (D.D.C. Aug. 3, 2020) ("*Tennant I*").  The below facts result from the parties' nearly two subsequent years of discovery.

One procedural issue complicating resolution of the pending motion requires comment at the outset. While defendant submitted a Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("SMF"), ECF No. 32-1, plaintiff's response to this document either admits or briefly disputes each statement made by defendant, but without also submitting plaintiff's own version of the facts, *see* Pl.'s Resps. to Def.'s SMF ("Pl.'s Resp. SMF"), ECF No. 33-1. That does not satisfy the requirement of Local Rule 7(h) that "[a]n opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." D.D.C. LCvR 7(h)(1). Similarly, plaintiff does not satisfy that requirement in her opposition by summarizing the factual background of the case, since that summary neither qualifies as a "separate concise statement," nor identifies which issues of fact are material, disputed, and require litigation. *See id.* Nonetheless, defendant submitted, in reply, a response to plaintiff's factual background summary that does what plaintiff should have—identifies the factual issues still in dispute. *See generally* Def.'s Resp. to Pl.'s SMF ("Def.'s SMF Resp."), ECF No. 38-1. That response to plaintiff's factual retelling serves as the backdrop for the following factual and procedural descriptions.

### A.     Plaintiff's Employment with Defendant

Plaintiff worked as a CSSD probation officer for almost nine years, from March 29, 2010, until her December 3, 2018, termination. *See* Def.'s SMF ¶ 1; Pl.'s Opp'n to Def.'s Mot. Summ. J ("Pl.'s Opp'n") at 2, ECF No. 33; Pl.'s Resp. SMF ¶ 1. In her role, from March 2014 to December 3, 2018, plaintiff was assigned to the Northeast Regional Office's Leaders of Today in Solidarity ("LOTS") Balanced and Restorative Justice Center ("BARJ"). *See* Pl.'s Opp'n, Ex. 4, Decl. of Denise Tennant ("Tennant Decl.") ¶ 8, ECF No. 36-3. The BARJ unit serves "youths

that either have juvenile criminal convictions or have demonstrated aggressive anti-social behavior" and provides them "after-school activities where they socialize, are fed and receive mentoring and instruction in academic and life-skills areas." *Id.* ¶ 10.  During her years of employment with defendant, including in her last performance review before her termination, plaintiff consistently received the rating of "Commendable performer."  *Id.* ¶ 4; *see also* Def.'s SMF Resp. ¶ 3.  She never received any counseling concerning her job performance nor was placed on a performance improvement plan.  *See* Tennant Decl. ¶ 5; Def.'s SMF Resp. ¶ 3.

### B.   Plaintiff's Grievances Regarding Sexual Harassment in the Workplace

Throughout the course of her employment, plaintiff compiled several grievances that implicate defendant's policies and procedures on prohibiting sexual harassment in the workplace. First, in 2013, plaintiff states that she was sexually harassed by a 16-year-old whom she supervised, but when she reported the incident to her supervisors, "nothing was ever done, and it was getting a lot worse" until she was transferred out of the unit "eight or nine months after [her] request."  Pl.'s Opp'n, Ex. 1, Dep. of Denise Tennant ("Tennant Dep.") at 90:2–21, ECF No. 36-2.  Second, in 2016, plaintiff states that she was identified by the U.S. Attorney's Office as a witness to a D.C. Superior Court criminal proceeding against Anthony Brooks, a CSSD-affiliated mentor accused of sexually harassing a child.  *See* Tennant Decl. ¶ 15.  According to plaintiff, Terri Odom, the director of CSSD and one of plaintiff's supervisors, resisted plaintiff assisting in the case until "a judge for the Superior Court intervened" and she was allowed to participate.  *Id.*

Then, starting in 2016, plaintiff perceived certain comments made by her immediate supervisor, Supervisory Probation Officer Lawrence Weaver, as sexual harassment.  During a team meeting in late 2016, Weaver allegedly told plaintiff and others in the group that "in breaking up a fight between two female juveniles, one of whom had an intellectual disability,

that 'I had to slam that bitch.'"  *Id.* ¶ 16.  In another alleged incident, as CSSD staff tried to handcuff a female youth as she resisted, Weaver stated, "[Y]ou guys couldn't do that.  You are a bunch of pussies."  *Id.*[1]

Plaintiff's uneasiness with Weaver continued into November 2017.  She claims that Weaver sat down next to her and shared his sexual history with prostitutes both before and during his marriage, much to the shock and offense of plaintiff.  *See id.* ¶ 17; Tennant Dep. at 66:14–69:19.  Plaintiff complains that Weaver's comments triggered symptoms of her post-traumatic stress disorder ("PTSD"), with which she was diagnosed in 2006.  *See id.* at 72:8–74:13.  Such symptoms include panic attacks and increased difficulty in focusing, memorizing information, or interacting with others.  *See id.* at 92:16–93:16 (plaintiff describing her PTSD symptoms); Def.'s SMF Resp. ¶ 1.  Following that conversation, plaintiff allegedly feared being alone with Weaver and avoided one-on-one interactions with him.  *See* Tennant Decl. ¶ 18.  Due to this fear, in January 2018, when Weaver requested that plaintiff accompany him to transport a child between locations, plaintiff declined his request, plus her scheduled off-duty time was within the subsequent half hour.  *See* Tennant Dep. at 75:10–19; Def.'s SMF Resp. ¶ 16.  Weaver emailed plaintiff describing her refusal to accompany him as her "being insubordinate." Tennant Dep. at 75:16–21; Def.'s SMF Resp. ¶ 16.

Shortly thereafter, plaintiff discussed the January 2018 incident as well as Weaver's November 2017 comments with Acting Supervisory Probation Officer Lisa McCants, one of plaintiff's other supervisors.  *See* Tennant Dep. at 70:1–71:3; Def.'s SMF Resp. ¶ 17.  Plaintiff

---

[1]     Defendant takes issue with plaintiff's recounting of statements uttered by Weaver and others, claiming that all such statements are inadmissible hearsay and thus should be excluded from consideration at the summary judgment stage.  *See* Def.'s Reply in Further Support of Mot. Summ. J. ("Def.'s Reply") at 6, ECF No. 38 (citing *Greer v. Paulson*, 505 F.3d 1036, 1315 (D.C. Cir. 2007)).  For purposes of resolving this motion, however, the statements of others recounted by plaintiff are considered, not for the truth of the matter asserted, but rather to describe their effect on plaintiff, thus qualifying as non-hearsay statements.  *See* FED. R. EVID. 801(c).

4

told McCants that Weaver's comments caused her discomfort, triggered her anxiety and panic attacks, and made her experience "extreme difficulty during [her] interactions with Weaver." Tennant Dep. at 71:1–7; Def.'s SMF Resp. ¶ 17.  According to plaintiff, McCants allegedly responded that plaintiff was a "good, valued employee" and that she could report to McCants instead of Weaver.  *See also* Tennant Decl. ¶ 20; Tennant Dep. at 71:7–9.  Although McCants told plaintiff she would speak to Weaver about his behavior, plaintiff claims that McCants did not do so nor did she report the incident to Assistant Deputy Director of CSSD Shelia Roberson-Adams.  Tennant Decl. ¶ 21.

### C.    A New Health Condition Causes Plaintiff's Increased Absences

Two months later, in March 2018, plaintiff informed McCants that she was diagnosed with adenomyosis, which plaintiff describes as "a physical condition that affects women and may result in heavy menstrual bleeding" with additional symptoms of "severe pain . . . making it difficult to work."  Tennant Decl. ¶ 14; *see also* Def.'s SMF Resp. ¶ 19.  During one painful episode on May 5, 2018, plaintiff contacted Weaver and McCants to report being sick, consistent with CSSD practices.  *See* Tennant Decl. ¶ 23; Def.'s SMF Resp. ¶ 20.  That same day, Robert Smith, a male probation officer with no disabilities, failed to appear for his shift without reporting sick or requesting a day off.  *See* Tennant Dep. at 24:22–26:5, 28:2–12; Tennant Decl. ¶¶ 24–25; Def.'s SMF Resp. ¶ 20.  Two days later, plaintiff was called into a meeting with Weaver, McCants, and Roberson-Adams during which meeting Weaver "criticized" plaintiff for failing to report on May 5 and threatened to charge plaintiff with "AWOL," presumably standing for "Absent Without Official Leave."  *See* Tennant Decl. ¶ 25; Def.'s SMF Resp. ¶ 21; *see generally* Pl.'s Opp'n, Ex. 8, Transcript of May 7, 2018 Supervisory Meeting ("May 7 Meeting Tr."), ECF No. 36-6.  During this meeting, plaintiff articulated that she called out sick on May 5

because of pain from her adenomyosis, a medical condition only affecting women, and that she was being treated differently from Smith, a man who was not criticized for his absence.  *See* May 7 Meeting Tr. at 40:2–41:12; Def.'s SMF Resp. ¶ 21.

The next month, on June 2, 2018, plaintiff and a male co-worker, probation officer Carlos Bernal, a man without any disabilities, were on duty at the BARJ.  *See* Tennant Dep. at 22:3–23:7; Def.'s SMF Resp. ¶ 22.   No children were present at the BARJ that day, so plaintiff says that she called McCants for permission for both herself and Bernal to leave early, which request McCants granted without any further directions to complete processing of their early-leave request.  *See* Tennant Dep. at 22:21–23:2; Def.'s SMF Resp. ¶ 22.  Defendant disputes that McCants gave plaintiff permission to leave early.  *See* Def.'s SMF Resp. ¶ 22.  To bolster her version of what occurred, plaintiff recalls that, on prior occasions, Weaver and McCants permitted plaintiff and other staff to leave early when no children appeared.  *See* Tennant Decl. ¶ 28.  In any event, on June 28, 2018, Weaver and McCants issued a recommendation to Odom that plaintiff be suspended for ten days for "failure to adhere to established tour of duty schedule[,]" specifically "[h]er departure from the [BARJ] at least two hours before the end of her tour of duty."  Pl.'s Opp'n, Ex. 10, Recommendation for Ten Day Suspension of Denise Tennant (June 28, 2018) at 1, ECF No. 36-7.  In comparison, Weaver and McCants only recommended that Bernal, who held a lesser seniority grade than Weaver, receive a Letter of Reprimand.  *See* Pl.'s Opp'n, Ex. 9, Recommendation for AWOL for Carlos Bernal (June 27, 2018), ECF No. 35-3; Tennant Decl. ¶ 26; Def.'s SMF Resp. ¶ 22.  Plaintiff appealed her suspension recommendation on August 7, 2018, *see* Pl.'s Opp'n, Ex. 24, Appeal of Notice of Intent to Recommend Ten (10) Day Suspension (Aug. 7, 2018), ECF No. 36-16.

Plaintiff met with Odom, Roberson-Adams, McCants, and Malcolm Woodland, another CSSD employee, on August 20, 2018, to discuss her appeal.  *See* Tennant Decl. ¶ 30.  In plaintiff's telling, she described her actions on June 2 and Odom agreed to review the record. *See id.*  Plaintiff used this opportunity to inform the group of her PTSD, anxiety, depression, panic attacks, and adenomyosis, *see* Tennant Dep. at 79:7–80:5; Tennant Decl. ¶ 31; Def.'s SMF Resp. ¶¶ 26–27, and further raised to the group her view that she was treated differently from male employees due to her adenomyosis, *see* Pl.'s Opp'n, Ex. 12, Notes from August 20, 2018 Meeting ("August 20 Meeting Notes") at 1, ECF No. 36-9 (noting that a "perception" shared at the meeting was, "I think there is discriminatory behavior between men and women").  Plaintiff also raised Weaver's earlier comments, in 2016 and 2017, that she deemed inappropriate and reported that, after she disclosed these comments to McCants, Weaver threatened her with AWOL in May 2018 and recommended a ten-day suspension for her June conduct despite Smith and Bernal receiving far less severe punishments.  *See* Tennant Decl. ¶ 31; Def.'s SMF Resp. ¶¶ 26–27.  Odom responded that plaintiff and Weaver had to find a way to work together, but neither Odom nor any other supervisor in attendance recommended that plaintiff seek assistance from defendant's Equal Employment Opportunity officer.  *See* August 20 Meeting Notes at 1; Tennant Decl. ¶¶ 31–32; Def.'s SMF Resp. ¶¶ 26.  Plaintiff also disclosed that her physician recommended that she take FMLA leave.  *See* Tennant Decl. ¶ 31; Def.'s SMF Resp. ¶ 25.

Following that meeting, plaintiff submitted the appropriate forms to request FMLA leave on September 7, 2018, *see* Tennant Decl. ¶ 27; Def.'s SMF ¶ 27, and her request for "continuous and intermittent" FMLA leave was approved on September 13, 2018, *see* Pl.'s Opp'n, Ex. 13, Email Approval of FMLA Leave (Sept. 13, 2018), ECF No. 36-10.

### D.    The September 2018 Incident and Plaintiff's Termination

On September 19, 2018, plaintiff and Weaver were on duty at the BARJ unit, along with Bernal and another CSSD employee Nathanial Johnson, attending to various children, including a thirteen-year-old girl, J.N.  *See* Tennant Dep. at 34:21–35:10; Def.'s SMF Resp. ¶ 28.  Various events that evening caused J.N. to become increasingly agitated, including Weaver throwing a ball at J.N.'s back, J.N. subsequently playing with that ball and distracting other children, and the denial of J.N.'s request for a reward for doing her homework.  *See* Tennant Dep. at 35:15–17, 36:1–14; Def.'s SMF Resp. ¶¶ 28–30.

Then, as the children ate dinner, plaintiff permitted J.N. and another child to have two juice boxes each, but allegedly after J.N. reported that she felt her attention-deficit/hyperactivity disorder "kicking in," plaintiff denied the children's request for a third juice and instead permitted them to have as much water as they liked.  *See* Tennant Dep. at 37:2–15; Def.'s SMF Resp. ¶¶ 30–31.  As plaintiff describes the incident, J.N. did not follow plaintiff's direction and took a third juice from a cooler and refused plaintiff's requests that she return the juice.  *See* Tennant Dep. at 37:16–19; Def.'s SMF Resp. ¶¶ 32–33.  After similarly unsuccessful pleas from Bernal and another adult in the room, plaintiff approached J.N. and demanded the juice, but J.N. attempted to knock plaintiff's hand away.  *See* Tennant Dep. at 38:2–6; Def.'s SMF Resp. ¶ 33.  Plaintiff says she grabbed J.N. by the wrist with one hand and used her free hand to grab the juice box from J.N.'s other hand.  *See* Tennant Dep. at 38:7–18; Def.'s SMF Resp. ¶ 33.  After plaintiff grabbed the juice, J.N. pulled the box back and squeezed its contents into plaintiff's face.  *See* Tennant Dep. at 38:18–20; Def.'s SMF Resp. ¶ 33.  Plaintiff then chased J.N. out of the room.  Tennant Dep. at 38:21–22; Def.'s SMF Resp. ¶ 34.

Security camera footage from the BARJ unit captured the entirety of the incident, *see* Pl.'s Opp'n, Ex. 2, Video of BARJ Unit (Sept. 19, 2018) ("Recording of Incident") at 18:55:00–19:00, showing additional details not included in plaintiff's recounting of the incident.  In response to J.N retrieving an extra juice box, plaintiff walks towards the child until she is standing right at J.N.'s back, aggressively grabs the child's arm with her two hands and repeatedly pulls the child's arm back forcefully as the child tries to escape.  *See* Recording of Incident at 18:59:02–18:59:06.  Plaintiff then uses one arm to pull the child back while simultaneously reaching for the juice box in the child's free hand.  *See id.*  Once she successfully obtains the juice box, plaintiff lets go of J.N. and motions the child to the other side of the room while holding the juice box over J.N.'s head.  *See id.* at 18:59:06–18:59:08.  J.N. then grabs the juice box from plaintiff, turns around, and squeezes the contents of the juice box into plaintiff's face.  *See id.* at 18:59:08–18:59:10.  Seemingly after recovering her senses, plaintiff runs at top speed to chase J.N. out of the room.  *See id.* at 18:59:10–18:59:11.  The two other adults in the room observing this incident then follow plaintiff and J.N. into the hallway.  *See id.* at 18:59:11–18:59:18.

Once court security officers detained J.N. in the hallway, plaintiff instructed them to call the police because she felt that J.N. had assaulted her.  *See* Tennant Dep. at 39:1–12; Def.'s SMF Resp. ¶ 34.  Upon the arrival of the police, plaintiff provided all relevant information and J.N. was arrested and taken into custody.  *See* Tennant Decl. ¶¶ 46–47; Def.'s SMF Resp. ¶ 35.[2] Plaintiff was told to report to the District of Columbia's Office of the Attorney General ("OAG")

---

[2]     Plaintiff notes that calling law enforcement when a probation officer is assaulted was consistent with CSSD's Graduated Sanctions Matrix, *see* Pl.'s Opp'n at 13–14 (citing Pl.'s Opp'n, Ex. 15, CSSD Graduated Sanctions Matrix, ECF No. 36-12), apparently to defend her conduct as comporting with defendant's disciplinary protocol in responding to J.N.'s conduct.  Despite the obvious lingering question of whether an agitated child squeezing juice in plaintiff's face constitutes an assault worthy of triggering a criminal arrest of a 13-year-old, defendant does not dispute that J.N. assaulted plaintiff.  *See* Def.'s SMF Resp. ¶ 34.

the next day for a follow-up interview.  *See* Tennant Decl. ¶¶ 46–47; Def.'s SMF Resp. ¶ 35.

Later that evening, plaintiff provided an incident report to McCants and Weaver, *see* Pl.'s Opp'n,

Ex. 16, Email from Tennant to McCants and Weaver (Sept. 19, 2018), ECF No. 36-13, as did her

co-workers who witnessed the incident, *see* Pl.'s Opp'n, Ex. 14, Email from H. Wade to Weaver

(Sept. 20, 2018), ECF No. 36-11; *id.*, Ex. 18, Incident Report Prepared by Bernal, ECF No. 39-1.

Plaintiff reported to OAG the next morning as instructed before proceeding with her scheduled

duties at D.C. Superior Court, as reported in defendant's recordkeeping system.  *See* Tennant

Decl. ¶ 53; Def.'s SMF Resp. ¶¶ 39–41.

　　　Neither McCants nor Weaver discussed the incident with plaintiff until five days later, on

September 25, 2018, during a meeting with the two supervisors, plaintiff, and Roberson-Adams.

*See* Pl.'s Opp'n, Ex. 5, Transcript of September 25, 2018 Meeting ("Sept. 25 Meeting Tr."), ECF

No. 36-4; Def.'s SMF Resp. ¶ 42.  At the meeting, plaintiff described the incident to the group,

with both a verbal and physical reenactment of how she merely grabbed J.N.'s wrist.  *See* Sept.

25 Meeting Tr. at 8:6–14.  At no point during that meeting did any of plaintiff's managers inform

her that her actions involving J.N. violated any CSSD policies or procedures or that she would

face any discipline.  *See* Def.'s SMF Resp. ¶ 43.  Rather, Roberson-Adams and plaintiff engaged

in a coaching session in which the former offered constructive criticism on how plaintiff could

have handled the situation and the particular challenges BARJ clients face.  *See, e.g.*, Sept. 25

Meeting Tr. at 36:5–13; Def.'s SMF Resp. ¶ 43.

　　　After the meeting, Roberson-Adams sent plaintiff various follow-up questions about the

incident via email, many of which plaintiff felt she had already answered at the meeting.  *See*

Tennant Decl. ¶¶ 59–60; Pl.'s Opp'n, Ex. 19, Email from Roberson-Adams to Tennant (Sept. 25,

2018) ("Roberson-Adams Emails") at 1–2, ECF No. 36-14.  Plaintiff received the email to her

work email account at 7:22 p.m. after working hours, thus plaintiff alleges that she did not see it that day.  *See* Tennant Decl. ¶¶ 59–60; Roberson-Adams Emails at 1.  At 5:29 p.m. on September 27, 2018, Roberson-Adams sent plaintiff another after-hours email acknowledging that plaintiff was out sick the day before but reminding her to respond to the prior email.  *See* Roberson-Adams Emails at 1.  Plaintiff claims that she did not see either of Roberson-Adams's emails until she returned to work on September 28, three days after the meeting.  *See* Tennant Decl. ¶¶ 61–62.  At the beginning of her shift that day, Weaver questioned her about her absences and demanded a response to an email he sent her while she was out.  *See id.* ¶ 62; Def.'s SMF Resp. ¶ 46.  He also questioned plaintiff's entries in defendant's court record-keeping system from September 20, 2018, and, in plaintiff's opinion, accused plaintiff of submitting false entries.  *See* Tennant Decl. ¶ 62; Def.'s SMF Resp. ¶ 46.  Plaintiff explained how a D.C. Superior Court judge called her while she was out sick, resulting in plaintiff's entries into the record-keeping system while on sick leave, and how she reported to court as scheduled on September 20, 2018.  *See* Tennant Decl. ¶ 62; Def.'s SMF Resp. ¶ 46.  Following that meeting, plaintiff became ill and reported off sick for the remainder of her shift on September 28, 2018.  *See* Tennant Decl. ¶ 62; Def.'s SMF Resp. ¶ 46.

The next day, while plaintiff was on duty at the BARJ unit, she received a message to call Roberson-Adams.  *See* Tennant Decl. ¶ 64; Def.'s SMF Resp. ¶ 48.  During that call, Roberson-Adams questioned plaintiff about her failure to respond to the former's emails.  *See* Tennant Decl. ¶ 64; Def.'s SMF Resp. ¶ 48.  Plaintiff replied that she believed she answered Roberson-Adams's emailed questions during their in-person meeting on September 25, 2018, but Roberson-Adams contended that she needed written responses.  *See* Tennant Decl. ¶ 64; Def.'s SMF Resp. ¶ 48.  Plaintiff responded to the email on October 1, 2018, stating that, "There was

physical contact when [J.N.] squeezed juice in [plaintiff's] face," *see* Pl.'s Opp'n, Ex. 20, Email

from Tennant to Roberson-Adams (Oct. 1, 2018), ECF No. 36-15, to which Roberson-Adams

responded hours later questioning whether plaintiff admitted to touching J.N. without mentioning

that plaintiff used both hands to hold onto J.N. arm and then one hand to restrain J.N., while

reaching for the juice box held by J.N., *see* Recording of Incident at 18:55:00–19:00.

Later that day, plaintiff met with Odom and saw the video recording of the incident.  *See*

*id.*  The record is unclear when defendant first uncovered this video, but the October 1, 2018,

meeting between plaintiff and Odom seems to be the first time plaintiff herself viewed the

recording.  According to plaintiff, Odom then accused plaintiff of assaulting J.N, *see* Tennant

Decl. ¶ 66, a claim defendant asserts is "[u]nsupported," Def.'s SMF Resp. ¶ 50.  Plaintiff denied

such conduct and went on to complain how she received no prior training on deescalating

situations with BARJ clients, despite her repeated requests for such instruction, nor any

indication during her previous meetings and discussions with supervisors that her actions on

September 19, 2018, violated any CSSD policies.  *See* Tennant Decl. ¶ 67.

Slightly over one week later, on October 9, 2018, a letter of reprimand was issued to

plaintiff for leaving work early on June 2, 2018.  *See* Pl.'s Opp'n, Ex. 11, Letter of Reprimand

for Denise Tennant (Oct. 9, 2018), ECF No. 36-8.  Less than two weeks after that, on October

22, 2018, Roberson-Adams recommended plaintiff's termination because of the J.N. incident,

*see* Pl.'s Opp'n, Ex. 25, Recommendation for Termination of Denise Tennant (Oct. 22, 2018)

("Termination Recommendation"), ECF No. 36-17, and Odom issued a notice of intent to

recommend termination on October 24, 2018, *see* Pl.'s Opp'n, Ex. 6, Notice of Intent to

Recommend Termination (Oct. 24, 2018), ECF No. 36-5.  Notably, Roberson-Adams's

recommendation included mention that plaintiff threatened J.N. during the altercation, stating,

12

"you better be glad the guards were here."  Termination Recommendation at 2.  Plaintiff had not

heard that accusation before reviewing Roberson-Adams's recommendation, nor was it included

in Weaver's report following investigation into the incident.  *See* Dep. of Lawrence Weaver

("Weaver Dep.") at 161:19–164:11, ECF No. 37-3.  Roberson-Adams's recommendation of

termination did not align with Weaver's recommendation, following his investigation, that

plaintiff receive only a suspension.  *See id.* at 145:11–146:12.

Defendant states that the cause of plaintiff's termination was the September 19 incident,

because plaintiff "incit[ed] the incident by refusing to allow a youth to drink juice; arbitrarily

creat[ed] a rule that only a certain amount of juice was permitted; . . . attempt[ed] to enforce her

arbitrary rule through physical force; . . . threaten[ed] the youth; and . . . fail[ed] to report [that]

she used physical force against the youth."  Def.'s SMF ¶ 16.  Plaintiff responded to the

recommendations on October 30, 2018, denying any wrongdoing, *see* Pl.'s Opp'n, Ex. 26,

Response to Notice of Intent to Recommend Termination (Oct. 30, 2018), ECF No. 36-18, and

received a Final Termination on November 26, 2019, *see* Compl. ¶ 74.  Plaintiff appealed her

termination and was given an evidentiary hearing on March 25 and 27, 2019, but her termination

was affirmed by D.C. Courts on May 15, 2019.  *See id.* ¶ 75.

Plaintiff cites five CSSD employees whom she claims engaged in substantially similar

conduct and were not disciplined for their actions.  First, Sokoyama Songu-Mbriwa, a male

probation officer with no disabilities or other protected characteristics, *see* Pl.'s Opp'n, Ex. 3,

Dep. of Herbert Rouson, Jr ("Rouson Dep.") at 139:5–16, ECF No. 37-1, allegedly placed a

CSSD youth in a chokehold after he perceived the child to speak to him in a disrespectful tone,

but was not disciplined for his conduct, *see* Tennant Dep. 56:18–59:21; Rouson Dep. at 133:20–

137:1; Weaver Dep. at 149:14–150:1.  Second, Scott Long, a male probation officer with no

disabilities or other protected characteristics, *see* Rouson Dep. at 139:5–14, pushed a CSSD-supervised child and instigated a fight without receiving any discipline for his actions, *see* Tennant Dep. at 60:4–62:11; Rouson Dep. at 107:3–110:11; Pl.'s Opp'n, Ex. 21, Incident Report of Scott Long, ECF No. 39-3.  Third and fourth, Kenrick Guilborne and Steven Dean, both male probation officers without any disabilities or protected characteristics, *see* Rouson Dep. at 139:8–12, both grabbed a CSSD-supervised young girl by her arms and legs and carried her out of a room without being disciplined, *see* Tennant Dep. at 62:15–65:6; Rouson Dep. at 137:2–138:3, 139:8–12; Pl.'s Opp'n, Ex. 22, Incident Report of Kenrick Guilborne and Steven Dean, ECF No. 39-4.  Finally, Tiffany Tinch, a female probation officer without any disabilities or other protected characteristics, *see* Rouson Dep. at 139:5–7, imposed her own rule when she denied a snack to a BARJ client who was not following rules, and was not disciplined, *see* Tennant Decl. ¶ 69(d); Rouson Dep. 138:4–139:7; Pl.'s Opp'n, Ex. 23, Incident Report of Tiffany Tinch, ECF No. 39-5.

## E.    Procedural Background

As summarized in *Tennant I*, plaintiff filed an EEOC charge of discrimination on January 7, 2019, and received a "Dismissal and Notice of Rights" letter from the EEOC on July 3, 2019. *Tennant I*, 2020 WL 4464505, at *5.  Plaintiff filed her complaint on October 1, 2019, alleging (1) discrimination on the basis of her sex in violation of Title VII (Count I), Compl. ¶¶ 85–92; (2) retaliation in violation of Title VII (Count II), *id*. ¶¶ 93–101; (3) discrimination on the basis of her disabilities in violation of the ADA (Count III), *id*. ¶¶ 102–09; (4) retaliation in violation of the ADA (Count IV), *id*. ¶¶ 110–21; and (5) interference with the exercise of her FMLA rights (Count V), *id*. ¶¶ 122–29.  Defendant then moved to dismiss Counts II, III, and IV for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), which was denied on August 3,

2020.  *See generally Tennant I.*  Defendant filed its answer to plaintiff's complaint shortly thereafter, on September 17, 2020, *see* Def.'s Answer, ECF No. 15, and the parties subsequently engaged in discovery for nearly two years, after which defendant filed the instant motion for summary judgment on all counts, *see* Def.'s Mot.  The motion is now ripe for review.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Navajo Nation v. U.S. Dep't of Interior*, 57 F.4th 285, 291 (D.C. Cir. 2023) (quoting FED. R. CIV. P. 56(a)).  The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49 (1986); *see also Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (noting that, on summary judgment, "[a]lthough all inferences must be viewed in a light most favorable to the non-moving party," summary judgment is proper "if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial" (internal citations omitted and formatting modified)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science."  *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and

all justifiable inferences are to be drawn in his favor," *id.* at 651 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation omitted); *see also Stoe v. Barr*, 960 F.3d 627, 629 (D.C. Cir. 2020).  In addition, for a factual dispute to be genuine, the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).  Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* (internal quotation omitted).  While the materials explicitly cited by the parties "need" to be considered, "other materials in the record" may also be reviewed at the court's discretion.  *See* FED. R. CIV. P. 56(c)(3).

"As employers rarely maintain records directly evidencing discrimination, 'an added measure of "rigor," or "caution," is appropriate in applying this standard to motions for summary judgment in employment discrimination cases.'" *Woodruff v. Peters*, 482 F.3d 521, 526-27 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir.

1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  At the same time,

courts need not accept as true claims made by a nonmovant that "rest[] entirely upon a

conclusory representation," because "[a]ccepting such conclusory allegations as true . . . would

defeat the central purpose of the summary judgment device, which is to weed out those cases

insufficiently meritorious to warrant the expense of a jury trial."  *Greene v. Dalton*, 164 F.3d

671, 675 (D.C. Cir. 1999) (affirming dismissal of a retaliation claim that "rest[ed] entirely upon a

conclusory representation" embodied in plaintiff's affidavit that lacked supporting facts); *see*

*also Jeffries v. Barr*, 965 F.3d 843, 864 (D.C. Cir. 2020) ("While this Court is bound to view the

facts in the light most favorable to [non-movant] and to draw all legitimate inferences therefrom

in his favor, . . . we will not step past inference into imagination.").

## III.   DISCUSSION

Defendant seeks summary judgment on all five claims in the complaint.  For the reasons

discussed in detail below, defendant's motion is granted in part and denied in part.  Defendant is

entitled to summary judgment on Count I (Title VII gender discrimination) and Count V (FMLA

interference claim) as well as one aspect of Count IV (ADA retaliation claim).  For Count II

(Title VII retaliation claim), Count III (ADA discrimination claim), and one aspect of Count IV,

defendant has failed to show the absence of a genuine issue of material fact central to those

claims and summary judgment on those counts is therefore denied.

### A.   Summary Judgment Is Appropriate as to Counts I and V

#### 1.   Count I: Plaintiff's Title VII Gender Discrimination Claim

Plaintiff first asserts that defendant discriminated against her on the basis of her gender,

resulting in her termination.  *See* Compl. ¶¶ 85–92.  Defendant posits, first, that plaintiff failed to

prove a prima facie case of discrimination because the two cited instances of alleged adverse

treatment—"attendance at a meeting . . . [and] a suspension that was merely recommended but

never occurred"—fail to qualify as adverse employment actions.  Def.'s Mot. at 5–6.  Defendant

adds that, because "there is no record evidence that similarly situated males were treated

differently" from plaintiff, "the District is entitled to judgment on Count I."  *Id.* at 5; *accord id.*

at 6–8.  Defendant is correct that plaintiff's potential comparators are not similarly situated, and

review of the record reveals that a jury could not reasonably find in favor of plaintiff on her

gender discrimination claim.

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate

against any individual "because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e-2(a)(1).  To prevail on a discrimination claim, plaintiff must show "she is part

of a protected class under Title VII, she suffered a cognizable adverse employment action, and

the action gives rise to an inference of discrimination."  *Wheeler v. Georgetown Univ. Hosp.*, 812

F.3d 1109, 1113–14 (D.C. Cir. 2016) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C.

Cir. 2015)).  The employer may then "articulate a legitimate, nondiscriminatory reason for its

action," which shifts the burden back to plaintiff to show "that the employer's stated reason for

its actions was in fact pretext for unlawful discrimination."  *Id.* at 1114.

An "adverse employment action" is "'a significant change in employment status," which

includes "hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing significant change in benefits.'"  *Baird v. Gotbaum*, 662

F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir.

2009)); *see also Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) (explaining same).  To

find that an adverse employment action occurred, the D.C. Circuit, until recently, required courts

to conclude that "a reasonable trier of fact could find objectively tangible harm" based on

"materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities." *See, e.g.*, *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). In *Chambers v. District of Columbia*, the D.C. Circuit revisited this rule to hold that an employee's forced transfer or denial of a transfer request because of that employee's protected status constitutes an adverse employment action, despite a lack of "objectively tangible harm" like economic impact. 35 F.4th 870, 874–75 (D.C. Cir. 2022). Instead, "[o]nce it has been established that an employer has discriminated against an employee with respect to that employee's terms, conditions, or privileges of employment because of a protected characteristic, the analysis is complete." *Id.* (internal quotation marks omitted).

In narrowly focusing on two actions plaintiff characterized as adverse, defendant overlooks that plaintiff's ultimate termination is the adverse employment action supporting plaintiff's prima facie case of discrimination. Defendant concedes that fact. *See* Def.'s SMF ¶¶ 12, 16. Thus, defendant's argument that plaintiff fails to make out a prima facie case of gender discrimination at all fails.

Defendant's next argument is correct, however, that the two other allegations of adverse treatment identified by plaintiff as adverse actions prohibited by Title VII fall flat. First, although plaintiff alleges that, after the mandatory meeting on May 7, 2018, she "suffered a loss of pay resulting from being placed on AWOL, an action that clearly affected her terms and conditions of employment," Pl.'s Opp'n at 24, she provides no evidence that such a pay cut occurred. Rather, the record, largely provided by plaintiff, shows that Weaver told plaintiff that "he ***could*** charge [her] with AWOL for May 5th[,]" a day on which she called out sick due to her adenomyosis, Tennant Decl. ¶ 25 (emphasis added), but no evidence shows that she in fact was docked any pay. Merely the threat of docking her pay following a perceived violation of an

attendance policy also does not suffice as an adverse employment action.  *Cf. Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (holding that job-related criticism and "sporadic verbal altercations or disagreements" do not amount to an adverse employment action); *Augustus v. Locke*, 934 F. Supp. 2d 220, 234 (D.D.C. 2013) (holding that plaintiff's allegations that her employer questioned certain of her duties and "remind[ed] her that she was on the pay for performance plan did not affect the terms or conditions of her employment"); *Hunter v. Clinton*, 653 F. Supp. 2d 115, 122–23 (D.D.C. 2009) (finding that plaintiff's complaints of increased scrutiny were not an adverse employment action for the purposes of discrimination or retaliation and noting that these allegations were akin to a poor performance evaluation).  Without more than inconsistent and conclusory allegations of conduct, plaintiff cannot establish that the threat of a pay decrease amounts to an adverse employment action under Title VII.

Relatedly, plaintiff's other allegations of adverse conduct, attendance at the mandatory meeting and a recommended 10-day suspension that was never served, suffer the same fate.  *See Baloch*, 550 F.3d at 1198 (finding that requiring plaintiff to provide a physician's certification of a health problem and dates of treatment were not materially adverse); *id.* at 1199 ("courts have been unwilling to find adverse actions where the suspension is not actually served"); *Augustus*, 934 F. Supp. 2d at 234 (concluding that employer's requirement that plaintiff sit at her desk from 7:45 a.m. to 9:00 a.m. every day did not amount to an adverse employment action); *see also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1555 (D.C. Cir. 1997) ("'interlocutory or [inter]mediate decisions having no immediate effect upon employment . . . were not intended to fall within the direct proscriptions of . . . Title VII'") (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)).

Regarding plaintiff's comparators, defendant repeats throughout its motion that none of those employees are similarly situated to plaintiff.  *See* Def.'s Mot. at 3–4, 7–8, 10–11.  To be sure, plaintiffs need not provide comparator evidence at all to establish a prima facie case under Title VII.  *See Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007).  That said, such evidence that an employee similarly situated to plaintiff, *e.g.*, with the same title or similar responsibilities but outside of her protected class, received different treatment for the same conduct is "[e]specially relevant" to a finding of pretext.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973); *see also Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) ("A plaintiff can raise an inference of discrimination by showing that she was treated differently from similarly situated employees who are not part of the protected class." (quotation omitted)); *Gipson v. Wells Fargo N.A.*, 460 F. Supp. 2d 15, 30 (D.D.C. 2006) ("Disparate treatment of similarly situated employees is the very essence of discrimination.").  Whether certain employees are similarly situated "ordinarily presents a question of fact for the jury."  *Wheeler*, 812 F.3d at 1115 (quoting *George v. Leavitt*, 407 F.3d 405, 414–15 (D.C. Cir. 2005)).  Yet, as a matter of law, a plaintiff "must demonstrate that she and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee.'"  *Id.* at 1115–16 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)).

Plaintiff's four male comparators, Sokoyama Songu-Mbriwa, Scott Long, Kenrick Guilborne, and Steven Dean, are, like plaintiff, probation officers employed with defendant and assigned to duties working with CSSD-supervised children.  Plaintiff claims that they all used physical force to restrain CSSD-supervised children, including by putting children in chokeholds, pushing and fighting a child, and grabbing a child's extremities and forcibly

removing her from a room, and that no comparable employee was disciplined for that conduct. *See* Compl. ¶ 78; Pl.'s Opp'n at 20–22.

Plaintiff, however, does not provide sufficient evidence that she is similarly situated to these individuals as a matter of law, given the notable lack of substantiation of plaintiff's key allegations about each comparator, which, given the serious nature of the allegations, would be expected to be available.  First, her claim that Songu-Mbriwa choked a child is wholly conclusory and unfounded in the record.  Aside from plaintiff's own allegation that the incident occurred, Herbert Rouson, D.C. Courts' Acting Deputy Executive Officer, testified that "inquiries were made" into the incident and no further evidence was uncovered from any other potential witnesses besides plaintiff, who "did not report the incident" at the time.  Rouson Dep. at 134:5–18.

Second, the incidents involving Long, Guilborne, and Dean were not of comparable seriousness nor were the circumstances nearly identical to those of plaintiff.  The record supports that Long and a child at the BARJ unit engaged in a physical altercation, but nowhere does the record indicate that the physical altercation included placing the child in a chokehold, as plaintiff contends.  *See* Incident Report of Scott Long at 3 (Long reporting that he engaged in the "physical altercation" but making no mention of a chokehold or a push); Rouson Dep. at 107:7–18 (similarly referring to Long's physical altercation).  Rather, the physical altercation followed the child approaching Long while repeatedly uttering verbal attacks and profanity.  *See* Incident Report of Scott Long at 3; Rouson Dep. at 107:7–18.  Court security officers were also able to intervene and calm the child, and Long neither called the police nor pressed charges.  *See* Incident Report of Scott Long at 1, 3; Rouson Dep. at 107:7–18.  Similarly, in response to a young girl in a restricted area of the BARJ jumping on tabletops and eventually falling from a

table, Guilborne grabbed the girl for her own safety and he and Dean "restrained [her] to take her

back to the appropriate side of the BARJ."  Rouson Dep. at 137:8–18.  Once released, the young

girl punched Guilborne in the face and was subsequently restrained as she attempted to kick him.

*See id.* at 137:18–138:1.  Court security officers handcuffed the child and she was later arrested,

with charges pressed against her.  *See id.* 138:1–3.  J.N. taking an extra juice box against

plaintiff's instructions in no way compares to verbal or physical attacks.  Rather, plaintiff's own

actions, initiating aggressive physical contact with J.N. for such a minor act of insubordination,

chasing her out of the room, and calling for J.N.'s arrest, escalated the seriousness of the

situation in a way that Long, Guilborne, and Dean did not do.  Thus, plaintiff is not similarly

situated to those employees as a matter of law.[3]

Having discarded of the potential comparators, of plaintiff's remaining evidence of

pretext, no reasonable jury could find that defendant terminated plaintiff due to intentional

discrimination based on her gender.  Plaintiff's gender discrimination claim is rooted in four

pieces of evidence: (1) defendant's history of allegedly disregarding claims of sexual

harassment, once in 2013 when plaintiff herself was sexually harassed and again between 2016

and 2017 when Odom resisted plaintiff's assistance in the Anthony Brooks investigation, *see*

---

[3]       The same conclusion applies to plaintiff's sole female comparator, Tiffany Tinch, a probation officer
without any disabilities, who, like plaintiff, withheld a snack from a child at the BARJ unit, but did so because the
child previously refused to participate in a group activity.  *See* Incident Report of Tiffany Tinch at 2.  Tinch's refusal
agitated the child, who then proceeded "yelling and screaming" down the hallway stating that she would get a snack
anyway.  *Id.*  Upon returning to the room, the child pushed past Tinch and headed towards the snacks, until Tinch
put the snacks in her hand and asked the child to leave the room.  *See id.*  The child then "began to push up against
PO Tinch and pushed her arm so far back that it began to hit [another probation officer] in his chest."  *Id.*  After
unsuccessfully asking the child to stop, Tinch removed the child's hand from her arm, at which time the child
grabbed various snacks and said that Tinch "wasn't going to do shit," before continuing to yell and scream.  *Id.*
Tinch then contacted the police after discussing the incident with her fellow employees who shared a "collective
concern that [the child]'s behavior seems to have escalated" from an incident the prior week.  *Id.*  In comparison to
plaintiff's incident with J.N., the incident involving Tinch was more serious as the child both initiated physical
contact with Tinch and yelled, screamed, and cursed at her, and Tinch's choice to call police after consulting with
her fellow employees regarding the best course of action for the child is not a similar circumstance as plaintiff's
choice to have the child arrested.  Thus, Tinch is also in inapt comparator for plaintiff's ADA claims.

Pl.'s Opp'n at 5; (2) Weaver's alleged comment in 2016 referring to a CSSD-supervised girl as a "bitch" and another alleged comment, made at an unspecified time, referring to CSSD-staff members as "a bunch of pussies;" *see id.* at 6; (3) Weaver's comments regarding his past and continued employment of prostitutes, *see id.*; and (4) the fact that plaintiff was diagnosed with adenomyosis, a condition that only affects women, *see id.* at 10.  Plaintiff asserts no hostile work environment claim and thus her allegations of defendant, in her view, disregarding claims of sexual harassment is irrelevant to her current claim of gender-based discrimination.  Weaver's two uses of derogatory terms also fail to rescue plaintiff's Title VII claim—one comment was made years before this dispute's relevant period and plaintiff does not specify whether Weaver was even referring to a woman when he used the word "pussies."  Use of this word, as well as Weaver's mention of his sexual exploits, may have made plaintiff uncomfortable, but does not lead to any logical conclusion of gender-based animus.  Moreover, regarding Weaver, despite any biases he may hold against women, the fact remains that Weaver did not recommend plaintiff's termination—he merely recommended that she be suspended following the J.N. incident.  *See* Weaver Dep. at 145:11–146:12.  The remaining contention, that defendant's gender-discriminatory animus based on plaintiff's adenomyosis diagnoses caused her termination, is weak at best and serves as a feeble attempt to repackage plaintiff's ADA claim under Title VII's protection without any more supportive facts in the record.

Based on review of the record as a whole, a jury could not reasonably conclude that plaintiff's termination was the result of gender discrimination.  Thus, summary judgment on Count I is appropriate.

### 2.    *Count V: Plaintiff's FMLA Interference Claim*

In Count V, plaintiff alleges that defendant, through its managers, "restrained Plaintiff in the exercise of her rights guaranteed under . . . the FMLA, including, but not limited to, frustrating Plaintiff's efforts to perform her job, badgering her about her use of FMLA-related leave, charging her with AWOL, issuing the letter of reprimand, placing her in non-duty status without pay and terminating her employment."  Compl. ¶ 124; *see also id.* ¶¶ 122–29. Defendant retorts that plaintiff's two instances of FMLA interference—the May 2018 mandatory meeting and the June 2018 recommendation for suspension—"took place before Plaintiff made a request under FMLA" and so "they cannot qualify as FMLA interference or retaliation."  Def.'s Mot. at 12.  Plaintiff fails to show a genuine factual dispute on Count V.

The FMLA makes unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]."  29 U.S.C. § 2615(a)(1).  A plaintiff establishes a claim for FMLA interference by proving "(1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference."  *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020); *accord McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 7 (D.C. Cir. 2010) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).  "The FMLA protects an employee's rights to take guaranteed leave, oppose or complain about an employer practice made unlawful by the statute, and participate in 'legal proceedings or inquiries relating to an employee's rights.'"  *Waggel*, 957 F.3d at 1377 (quoting 29 C.F.R. § 825.220(a)).

A jury could not reasonably conclude that plaintiff suffered from interference of her FMLA rights.  The parties agree that plaintiff was approved for "continuous and intermittent"

FMLA leave on September 13, 2018.  Pl.'s Opp'n at 11 (citing Pl.'s Opp'n, Ex. 13, Notification

of Denise Tennant's Approval for FMLA Leave); *see also* Def.'s SMF ¶ 5.  Plaintiff asserts that

she "exercised her FMLA rights in August 2018" and that she was terminated five weeks after

she was approved for FMLA leave, "obviously denying and restraining Plaintiff's further

exercise of those FMLA rights."  Pl.'s Opp'n at 41.  At the outset, plaintiff's disclosure to Odom

that "her physician recommended that she take FMLA leave" is not opposition conduct under the

FMLA because, at the time, she was not complaining that defendant was taking any act in

violation of the FMLA.

　　　　Aside from that instance, plaintiff includes a supposedly non-exhaustive list of examples

of interference in her complaint, notably missing from her opposition brief—"frustrating

Plaintiff's efforts to perform her job, badgering her about her use of FMLA-related leave,

charging her with AWOL, issuing the letter of reprimand, placing her on non-duty status without

pay and terminating her employment."  Compl. ¶ 124.  While that list is largely inexact, one

claim is clarified in plaintiff's opposition.  From the time plaintiff was approved for FMLA leave

on September 13, 2018, until her termination recommendation in October 2018, she took FMLA

leave three times, full days out sick on September 26 and 27 and a half day out sick on

September 28.  While she was on-the-clock on September 28, Weaver "questioned her about her

whereabouts and demanded a response to an e-mail that he also had sent to Plaintiff's work e-

mail address while she was out on sick leave."  Pl.'s Opp'n at 18.  Weaver also "accused

Plaintiff of falsely entering activities into [defendant's system] when she was on sick leave" on

September 20, 2018.  *Id.*  Plaintiff responded by informing Weaver about her prior sick days and

correcting him on her work schedule on the day in question.  *See id.* (citing Tennant Decl. ¶ 62).

Yet, an employer may ask questions into "the circumstances of [an employee's] FMLA leave"

without interfering with rights preserved by the FMLA.  *See, e.g.*, *Williams v. Verizon Washington, D.C. Inc.*, 304 F. Supp. 3d 183, 193–94 (D.D.C. 2018) (finding that the employer's "legitimate attempt to look into how [plaintiff] had conducted himself during the FMLA medical leave . . . was entirely warranted based on the troubling facts that were brought to the company's attention").  Plaintiff similarly does not provide evidence that this sole interaction dissuaded her from taking further FMLA leave; in fact, shortly after that exchange, plaintiff called out sick for the rest of the day.  *See* Tennant Decl. ¶ 62.  Although plaintiff may have been discomfited by various incidents while employed with defendant, she has not presented sufficient evidence to raise a genuine factual dispute that defendant interfered with her exercise of FMLA rights. Defendant is thus entitled to summary judgment on Count V.

      **B.**      **Summary Judgment Is Denied as to Counts II, III, and IV**

            *1.*      *Counts II and III: Plaintiff's Title VII Retaliation Claim and ADA Discrimination Claim*

      Plaintiff alleges in Counts II and III, respectively, that defendant retaliated against her for opposing gender-discriminatory conduct, in violation of Title VII, *see* Compl. ¶¶ 93–101, and that defendant discriminated against her on the basis of her disability, in violation of the ADA, *see id*. ¶¶ 102–09.  Defendant's critique is the same for both counts: that plaintiff fails to put forth any evidence that her termination was caused by either opposition conduct protected under Title VII, *see* Def.'s Mot. at 9 ("Plaintiff's intervening conduct, giving rise to her legitimate, non-retaliatory termination, erodes any causal connection suggested by the temporal proximity of her protected conduct and her termination. . . . [and] Plaintiff has no other evidence of causation . . . because her incident with the youth in September 2018, is an intervening act[.]"), or disability-based animus in violation of the ADA, *see id.* at 10 (challenging plaintiff's ability to "prove that the District discriminated against her on the basis of any purported disability" because, in

defendant's view, "[t]here exists no evidence Plaintiff's claimed disabilities were a 'motivating factor' in the decision to terminate her").  The record, just barely, presents enough evidence to raise a factual dispute as to Counts II and III.

To prove a prima facie case of retaliation under Title VII, plaintiff must show that "(1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action."  *Menoken v. Dhillon*, 975 F.3d 1, 5 (D.C. Cir. 2020) (citing *Hairston v. Vance-Cooks*, 773 F.3d 266, 275 (D.C. Cir. 2014)) (formatting modified).  A plaintiff can prove causation "by showing a tight temporal proximity between protected activity and an adverse employment action."  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019).  Once plaintiff satisfies the prima facie requirements, the employer may proffer "a non-retaliatory explanation for the adverse employment action," after which point a court must decide whether plaintiff has "'put forward enough evidence to defeat the proffer and support a finding of retaliation.'"  *Id.* (quoting *Woodruff*, 482 F.3d at 530).

As to plaintiff's disability discrimination claim, the ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Once a plaintiff establishes a prima facie case of discrimination under the ADA, like a Title VII claim, the employer may counter with "legitimate, nondiscriminatory reasons for an adverse employment action," necessitating the court to then consider "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the plaintiff on a prohibited basis." *Waggel*, 957 F.3d at 1373 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)).[4]

Plaintiff barely surpasses the threshold of presenting a genuine factual dispute as to pretext.  First, plaintiff provides evidence that, during the relevant period, her supervisors were frustrated with her continued absences due to her PTSD and adenomyosis.  *See, e.g.*, May 7, 2018 Meeting Tr. at 40:2–41:6 (plaintiff describing her impression that her continued absences due to her adenomyosis would affect her performance reviews despite her efforts to comply with defendant's policy for taking sick leave and Roberson-Adams responding that "everything you do affects your performance"); Tennant Decl. ¶¶ 62 (upon returning from sick leave on September 28, 2018, Weaver questioned plaintiff's record-keeping entries made on a day when she was supposedly out sick and "accused [her] of falsely entering activities"), 64 (plaintiff recalling how Roberson-Adams "hostilely" questioned her once plaintiff returned to work regarding plaintiff's failure to respond to Roberson-Adams's emails while plaintiff was on sick leave); Roberson-Adams Emails at 1–2 (Roberson-Adams emailing plaintiff twice requesting her response to follow-up questions about the J.N. incident).  Defendant does not dispute that any of these incidents occurred.  *See, e.g.*, Def.'s SMF Resp. ¶¶ 21 (referring to plaintiff's recounting of the May 7, 2018 meeting as "undisputed"), 45 (referring to Roberson-Adams's emails demanding a response from plaintiff as "undisputed"), 46 (referring to plaintiff's recounting of

---

[4]     A plaintiff asserting a prima facie case of discrimination under the ADA must prove "that he had a disability within the meaning of the ADA, that he was 'qualified' for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability."  *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) (quoting *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001)).  Defendant states that plaintiff fails to prove that discrimination was the "motivating factor" for the adverse employment action she suffered, *see* Def.'s Mot. at 10, raising the question of whether plaintiff must prove that discrimination was a "motivating factor" in her termination or the "but-for" cause of her termination.  This question need not be resolved here, however, because regardless of the applicable standard, plaintiff has provided sufficient evidence to support the presence of a factual dispute regarding Count III.

Weaver's skepticism of her absences as "undisputed), 48 (referring to plaintiff's recounting of Roberson-Adams's "hostile[]" questioning as "undisputed").

Second, throughout plaintiff's nearly nine years of employment with defendant, she consistently received ratings of commendable work performance with no prior disciplinary incidents until the several months leading up to her termination. *See* Tennant Decl. ¶¶ 4–5; Weaver Dep. at 106:1–7 (describing plaintiff's work performance from 2016 to 2018 as "commendable"); Def.'s SMF Resp. ¶ 3 (referring to plaintiff's employment history as "undisputed"). Substantial criticism regarding her work performance did not begin until plaintiff took sick leave due to her PTSD and adenomyosis in 2018 and following her August 2018 complaint about gender-based disparate treatment in the workplace.

Third, in the five meetings and conversations between plaintiff and her supervisors following the J.N. incident, plaintiff was never told that she violated any of defendant's policies in her handling of J.N.—only at plaintiff's sixth meeting about the incident with Odom was she told that her actions were worthy of punishment. That record could imply that, upon subsequent investigation, defendant's discovery and review of the recorded incident justified escalated disciplinary action, such as termination. Yet the actual timeframe of the recording's discovery and review by plaintiff's supervisors is not presented in the record, and reasonable minds could differ as to the role this video played in plaintiff's termination.

Fourth, defendant claims to have terminated plaintiff for twice concealing that she grabbed J.N. by the wrist, first during the September 25, 2028, meeting and again in a follow-up email on October 1, 2018. *See* Def.'s Mot. at 3. This claim is belied by the September 25 meeting transcript, which reveals that plaintiff described, both verbally and physically by reenactment, how she grabbed J.N.'s wrist. *See* Sept. 25 Meeting Tr. at 8:6–14. Finally, plaintiff

30

denies using any threats towards J.N. during the incident and further notes that the accusation about her making a threat was raised for the first time in Roberson-Adams's termination recommendation letter, not during any meetings plaintiff had with her supervisors nor in Weaver's investigatory report into the incident.

In comparing those allegations with defendant's alleged non-discriminatory reason for plaintiff's termination, plaintiff has presented a sufficient record to create a genuine factual dispute such that a jury could reasonably find that defendant acted with discriminatory animus on the basis of plaintiff's disability or her opposition conduct or, in the alternative, that plaintiff was terminated for her handling of the J.N. incident on September 19, 2018, including her subsequent under-reporting of, or omissions in, her reports about the extent of her physical contact with J.N. *See, e.g.*, *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 32–33 (D.C. Cir. 1997) (reversing a grant of summary judgment on a retaliation claim because a jury could reasonably find that the employer terminated plaintiff for a non-discriminatory reason or that the employer terminated plaintiff in retaliation for his protected activity, and reasoning that "at the summary judgment stage we must accept [plaintiff's] version of the facts"). Either conclusion would be the resolution of a factual dispute after weighing the evidence, such as the video recording of the incident, and assessing witnesses' credibility—a task solely of the jury and not the Court. *See Reeves*, 530 U.S. at 150–51.

To be clear, "proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'" *Reeves*, 530 U.S. at 146–47 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). Put another way, the fact that a finding of discrimination is *permissible* does not

render that finding *required*.  *See id*. at 147–48.  The facts in this record, with all inferences drawn in plaintiff's favor, crosses the threshold into permissibility.

Consequently, defendant's motion for summary judgment on Counts II and III are denied.

### 2.    *Count IV: Plaintiff's ADA Retaliation Claim*

Plaintiff claims in Count IV that defendant retaliated against her for opposing discriminatory conduct in violation of the ADA.  *See* Compl. ¶¶ 110–21.  Defendant challenges only one aspect of plaintiff's prima facie case: that she did not engage in any protected activity within the temporal proximity of her October 2018 termination recommendation.  *See* Def.'s Mot. at 11 ("Plaintiff testified that the only accommodation request she made was in 2013. . . . The District is entitled to judgment because the decision to terminate Plaintiff's employment occurred in October 2018—more than five years after her accommodation request.").  Plaintiff counters that her protected activities occurred on May 7, 2018, and August 20, 2018, when she complained to her supervisors of the differential treatment she received because of her disabilities.  *See* Pl.'s Opp'n at 39–40.  Defendant responds that plaintiff's May 2018 complaint is "too far removed from Plaintiff's October termination for Plaintiff to establish any causal connection between the complaint and her termination[,]" and that her conduct during the September 19, 2018, incident was the cause of her termination, not the August 2018 complaint.  Def.'s Reply at 15–16.[5]  Defendant's position is flawed.

---

[5]      Defendant twice misconstrues plaintiff's claims in its motion.  First, defendant mischaracterizes plaintiff's argument to be that she was wrongfully denied a reasonable accommodation under the ADA, *see* Def.'s Reply at 15–16, but that is not plaintiff's assertion, *see* Compl. ¶¶ 111–12 ("Between January 2018 and December 2018, Plaintiff took steps to ***oppose*** the interference with her rights protected by the ADA by informing them of her protected disabilities, as well as making informal and formal complaints of disability discrimination to Defendant's representatives[.] . . . After Plaintiff opposed practices made unlawful by the ADA, she suffered materially adverse actions, including the letter of reprimand, her proposed termination, being placed in non-status without pay and being terminated." (emphasis added)).  In fact, nowhere in the complaint does plaintiff mention her desire for a reasonable accommodation for her disabilities.  *See generally id.*  Second, defendant also mischaracterizes plaintiff's claim to be that her disclosure of her medical condition was not opposition conduct protected by the ADA, *see* Def.'s Reply at 15–16, which again is not what plaintiff alleges, *see* Compl. ¶¶ 111 ("Plaintiff took steps to ***oppose***

The required elements for a prima facie case of retaliation under the ADA are the same as those for a retaliation claim under Title VII, as described above, *see supra* Section III.B.1. *See also Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (adopting the Title VII retaliation standard for ADA retaliation cases and listing the "three elements of a prima facie case of [ADA] retaliation" as (1) the plaintiff has "engaged in protected activity"; (2) the plaintiff "was subjected to adverse action by the employer"; and (3) "there existed a causal link between the adverse action and the protected activity" (internal quotation marks and citation omitted)). A protected activity includes an individual "oppos[ing] any act or practice made unlawful by [the ADA]." 42 U.S.C. § 12203(a).

Plaintiff engaged in protected activity under the ADA's retaliation provision during the August 20, 2018, meeting when she "complained that [she] was being singled out and was being treated differently . . . because of [her] Adenomyosis and mental health conditions," which she believed violated the ADA. Tennant Decl. ¶ 31.[6] Defendant is correct that any opposition conduct in which plaintiff engaged on May 7, 2018, is indeed too remote to support a causal link between that conduct and her October 2018 termination. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012). Nonetheless, for the reasons explained previously, *see supra* Section III.B.1, plaintiff provides just enough facts to present a genuine dispute to a jury that her August 2018 complaint of disability discrimination caused her termination.

Thus, defendant's motion for summary judgment on Count IV is granted in part and denied in part. Plaintiff may assert at trial that defendant terminated her in retaliation for her

---

the interference with her rights protected by the ADA by informing them of her protected disabilities, as well as making formal and informal complaints of disability discrimination to Defendant's representatives[.]" (emphasis added)).

[6]     To be sure, in its motion, defendant does not challenge whether plaintiff's belief that defendant violated the ADA was reasonable, *see* Def.'s Mot. at 11; therefore, this Court has no occasion to consider the issue.

August 20, 2018, complaint to her supervisors regarding discrimination on the basis of her disability.  She may not, however, assert the same regarding her May 7, 2018, complaint.

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.  Specifically, summary judgment in defendant's favor is granted as to Count I (Title VII gender discrimination) and Count V (FMLA interference claim) as well as one aspect of Count IV (ADA retaliation claim to the extent predicated on plaintiff's May 7, 2018 complaint), but otherwise denied as to Count II (Title VII retaliation claim), Count III (ADA discrimination claim), and part of Count IV (ADA retaliation claim to the extent predicated on plaintiff's August 20, 2018 complaint).

The parties are directed jointly to submit, by August 22, 2023, a status report proposing a schedule to govern further proceedings in this matter, unless the parties request referral to mediation for a period of up to ninety days.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  August 9, 2023

_____

**BERYL A. HOWELL**
United States District Judge